984 So.2d 1079 (2008)
A.J. STOVALL, Appellant
v.
W.L. HAYES and Holly Springs Tire, Appellees.
No. 2006-CA-02144-COA.
Court of Appeals of Mississippi.
June 17, 2008.
*1080 Latrice Westbrooks, Jackson, attorney for appellant.
Kent E. Smith, Justin Strauss Cluck, Holly Springs, attorneys for appellees.
Before LEE, P.J., BARNES and ISHEE, JJ.
LEE, P.J., for the Court.

FACTS
¶ 1. A.J. Stovall began experiencing problems with his 1998 Plymouth Dodge Neon in April 2005. A dispute over the bill for repairs made to the car led to this suit.
¶ 2. After attempts at several other automotive shops to get his Plymouth Dodge Neon repaired, Stovall took his car to Holly Springs Tire in Holly Springs, Mississippi. A mechanic at Holly Springs Tire, Greg Wilson, told Stovall he could fix the car. Upon Wilson's statement, Stovall told him, "if you can fix it, then fix it." Stovall left the car at Holly Springs Tire the following Monday, August 15, 2005, and picked it up later that day. When Stovall picked up the car, he talked to William Hayes, the manager. Hayes gave Stovall a receipt for $162. The receipt was for wiper blades, a thermostat, and coolant in the air conditioner. Although he felt some of the purchases were unnecessary, Stovall did not complain about the receipt and paid for the parts and repairs. Stovall left the shop, and before driving too far from Holly Springs, the car began running hot again. He had it towed back to Holly Springs Tire. Wilson did more diagnostic testing and determined that the car needed a water pump. Stovall purchased the water pump, which Wilson installed. Wilson then informed Stovall that the water pump did not correct the problem and that the car needed a new timing belt.
¶ 3. Stovall purchased and delivered a timing belt to Holly Springs Tire. Once the timing belt was replaced, Wilson ran another test on the car and determined that the car's head gasket needed to be replaced. Stovall purchased and delivered the head gasket, which fixed the car's problem of running hot. The cost of the additional labor was not discussed. Stovall's car remained at Holly Springs Tire for the next two weeks.
¶ 4. According to Stovall, he initially told Wilson that he did not want to spend much money on the car. Stovall testified that he asked for a flat rate for the repairs to the car. He stated that Wilson quoted him a price of $200. Stovall also stated that before he paid the $200 he wanted to test drive the car for two days. Stovall said Wilson accepted his terms by saying, "deal." Wilson denied ever quoting Stovall a price for the repair. Wilson and Hayes testified that all estimates are handled by Hayes and that the mechanics are not authorized to give estimates.
¶ 5. When Stovall went to pick up his car, he was given a bill for $868.22. Stovall took the bill to Wilson to dispute the amount. Wilson sent Stovall to Hayes who reduced the bill by $200. Stovall refused to pay.

PROCEDURAL HISTORY
¶ 6. On September 30, 2005, Stovall filed a replevin action in the Marshall County *1081 Justice Court against Hayes and Holly Springs Tire. The justice court ruled in favor of Hayes and Holly Springs Tire and ordered Stovall to pay $400 for the return of his car. Stovall appealed the decision to the Marshall County Circuit Court. After a hearing, the circuit court found that the oral contract was modified by a subsequent course of dealings and course of conduct. The circuit court entered a judgment in favor of Hayes and Holly Springs Tire in the amount of $868.22 and ordered that Stovall be given possession of the car.
¶ 7. Stovall now appeals asserting the following issue: whether the circuit court erroneously found that mutuality of consent existed between Stovall and any representative of Holly Springs Tire to modify their original agreement to repair the car for $200. Finding no error, we affirm.

STANDARD OF REVIEW
¶ 8. In reviewing the decision of a trial judge sitting without a jury, this Court may only reverse when the findings of the trial judge are manifestly wrong or clearly erroneous. Singley v. Smith, 844 So.2d 448, 451(¶ 9) (Miss.2003). A circuit judge sitting without a jury is accorded the same deference as a chancellor; his or her findings will not be overturned if supported by substantial evidence. Id. Additionally, when sitting as the finder of fact, the trial judge has the sole authority for determining the credibility of witnesses. Yarbrough v. Camphor, 645 So.2d 867, 870 (Miss.1994).

DISCUSSION
¶ 9. Stovall argues that he made a verbal contract with Wilson to make any necessary repairs to his car for $200, and this contract was not modified by any subsequent dealings. Stovall also argues that Wilson had apparent authority to act as an agent for Holly Springs Tire, and Stovall relied to his detriment on representations made by Wilson. Hayes and Holly Springs Tire argue in response that Hayes, as the manager, was the only one authorized to give price quotes, and no discussion regarding price took place between Stovall and Wilson.
¶ 10. The circuit court found as follows:
The agreement, if any, that was entered into couldn't have plausibly deemed [sic] to have included the various and sundry changes in the scope of the work in connection with the repair of the car and any express or implied agreement that was modified by the subsequent course of dealings and the course of conduct of the plaintiff and defendant. . . .
¶ 11. When the discussion, if any, of Stovall paying a set price of $200 took place, the item needing to be replaced was a timing belt. The mechanic later discovered that the head gasket, not the timing belt, was the problem. Stovall admits a mutual agreement was made that the part which needed to be replaced differed from the original agreement. However, Stovall argues that, regardless of the change in work that needed to be done, there was no mutuality of consent to change the price.
¶ 12. "Any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties." Kelso v. McGowan, 604 So.2d 726, 731 (Miss.1992) (quoting 3 A. Corbin, Contracts § 574 at 373-75 (1960)). In order for such a subsequent agreement to effect a modification, it must meet the requirements for a valid contract. Singing River Mall Co. v. Mark Fields, Inc., 599 So.2d 938, 947 (Miss.1992). A valid contract requires an offer and acceptance. R.C. Constr. Co. v. Nat'l Office Sys., 622 So.2d 1253, 1255 (Miss.1993). Failure to communicate acceptance of an offer is fatal to creation of a valid contract. Id.
*1082 ¶ 13. Presented with conflicting evidence, the circuit court did not rule on whether an oral contract was formed setting a price of $200. This Court also finds it unnecessary to determine if a contract was formed. Even if an oral contract was formed, the original terms of the purported contract were modified when the mechanic discovered the head gasket, rather than the timing belt, needed to be replaced. No agreement was made as to price once the parties agreed to the replacement of the head gasket.
¶ 14. Stovall argues that the following evidence showed his lack of mutual consent to change the price: "(1) he continuously asked if the charge will [sic] still be $200 and (2) the price of $868.22 was reduced by $200." We cannot find these two assertions to be evidence of lack of mutual consent. First, no evidence was presented that Stovall "continuously asked" if the charge would be $200. Stovall testified that he would stop by the shop to ask when the car would be ready, but he did not testify that he discussed a price. Second, his testimony that Hayes offered to reduce the bill by $200 does not show that they agreed to a set price of $200. To the extent Stovall may be asserting that he is entitled to a $200 reduction from the price of $868.22 due to Hayes's offer to reduce the bill, we find that argument without merit. Hayes's offer to reduce the bill was an attempt to settle the dispute. Stovall did not accepted the offer and instead instituted litigation. We cannot find that Hayes can be bound by the offer at this point. We find Stovall's assertions to be without merit.
¶ 15. We find the circuit court's decision was not manifestly wrong or clearly erroneous in finding that an oral contract setting a price for services at $200, even if formed, was modified by the subsequent agreement for additional services.
¶ 16. THE JUDGMENT OF THE MARSHALL COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS, J.
IRVING, J., Dissenting:
¶ 17. The majority affirms the circuit court's finding that any contract that was made between Stovall and Holly Springs Tire did not include the cost of installing a head gasket. Having reviewed the record, I cannot reach the same conclusion and must respectfully dissent.
¶ 18. First, the majority finds that "[e]ven if an oral contract was formed, the original terms of the purported contract were modified when the mechanic discovered the head gasket, rather than the timing belt, needed to be replaced. No agreement was made as to the price once the parties agreed to the replacement of the head gasket." However, my review of the record leads me to conclude that the oral agreement, as testified to by Stovall, contemplated that whatever was required to fix the car would be done for two hundred dollars. Stovall testified as follows:
When I go back to see the mechanic again [after the installation of the water pump], he said, You're going to need a timing belt. What I said to him was that remember when I brought this to you that I told you I didn't want to spend a lot of money. You said that you could fix it. How much is it going to cost me for you to fix it? I'm not going beyond that. He said, $200.

*1083 * * * *
[After being asked why he returned to Holly Springs Tire after it failed to fix the car the first time.] Well, because to go any place else  well, first of all, he said he could do it. Okay? I'm going to give him the benefit of the doubt. . . . Well, now that it is stopped again, the only logical thing is to go back to the person who had been working on it since he guaranteed that he could fix it. Okay? He said the water pump, so I'm thinking the water pump labor is going to be not very much; but after he tells me that the water pump won't do it, so now I need to get an agreement from him, a verbal agreement as to how much. He said $200. I said, You're going to fix it for $200. I'm not going to pay you any more than that. The other thing is when I pick it up, I want to drive it for two days. If it works for two days, I will bring the money. He says, Okay. Deal.
* * * *
Again, like I said, I figure if I'm going to buy the water pump, the labor was not going to be very much. I figured it wouldn't be over $100. Again, the position I took is I had a certain amount I was going to spend on this car, and if he could fix it, it's fixed. Okay? He said he could fix it, so go ahead.
* * * *
Yes. This is the time [when Stovall was told that the timing belt would have to be replaced] I need to know when this is going to stop. I'm talking to the guy and he says  he gives me the figure of $200. I said, That's it. I'm not going to pay any more than $200. I'm going to go get the timing bell [sic]. Again, I'm buying the parts. Okay? If $200 is going to do it, that's going to be it. The thing was I'm not going to give him  that's what I said. I'm not going to give him any money until I drive it for two days.
* * * *
The man said he could fix the car. How much can you fix it for? $200. That was the agreement that I had.
* * * *
When I asked him at some point between the water pump and the timing bell [sic], he said, $200. I said, You're going to fix it for $200 and it's fixed? He said, Yes. From that point on every time I brought him a part, I said, I'm going to pay the money after I drive it for two days. He said yes on every occasion.
* * * *
The man told me he could fix the car. Okay? Then when [sic] he told me the parts he needed to fix it, so therefore, when he told me he needed the parts to fix it, I bought them. The reason why  see, once we had agreed upon that his cost [sic] would not exceed $200, now it was a matter of me deciding would the cost of a part exceed what I wanted to pay.
(Emphasis added). Stovall's attorney even asked directly, "Now, when the head gasket came into the picture, were you quoted a different price?" Stovall responded in the negative.
¶ 19. The circuit court declined to make a finding of fact regarding whether Stovall and Holly Springs Tire formed a contract. Rather, the court simply found that any contract, if one had been formed, "couldn't have plausibly deemed [sic] to have included the various and sundry changes in the scope of the work in connection with the *1084 repair . . . and any express or implied agreement that was modified by the subsequent course of dealing and the course of conduct of the plaintiff and the defendant. . . ." Yet, Stovall was very clear that the oral agreement he had with Holly Springs Tire encompassed whatever it took to fix the car. Stovall was also very clear that Greg Wilson, a mechanic at Holly Springs Tire, made the offer of two hundred dollars. Since Wilson had examined the car, he presumably had an idea of what it would take to fix the car, and obviously, his offer was based on that examination. I believe that this interpretation is further supported by William L. Hayes's[1] testimony, wherein he stated that labor for the water pump and timing belt came to only $125, leaving a significant portion of the total, $75, unaccounted for.
¶ 20. Based on all of the above, I would reverse and render judgment here for $226.71[2] in favor of Hayes and Holly Springs Tire, instead of the $868.22 rendered by the circuit court.
¶ 21. The majority states that "Wilson and Hayes testified that all estimates are handled by Hayes and that the mechanics are not authorized to give estimates." Having reviewed the record, I am compelled to view the facts in a different light. In my opinion, Wilson testified, at most, that estimates were normally given by Hayes inside the building. However, I cannot find where either Wilson or Hayes specifically testified that mechanics at Holly Springs Tire are not authorized to give estimates. During direct examination, Wilson testified as follows:
Q. Did you ever make any kind of deal about how much it would cost 
A.  No, I did not 
Q.  to repair the vehicle?
A. That was out of my hands.
During cross-examination, however, Wilson admitted to quoting Stovall's price for the initial work that was done on the car:
Q. Because you did quote him a price of $162.60 the first time he brought you the car, correct?
A. Yeah. . . .
However, Wilson later claimed to be unable to remember whether he had quoted the initial price for the repairs. Notably, Wilson never claimed that he was unauthorized to give price estimates to customers; he merely stated that he could not recall giving one to Stovall. Wilson did, however, indicate that the norm was for customers to receive a price quote from the office:
Q. Okay. So as a mechanic and in your 25 years' experience, they [the customers] tell you what the problem is, or they tell you that my car needs to be fixed, and then you tell them this is how much I can fix it for, right?
A. No, I don't do that.
Q. That's normally how it goes in the mechanic business, isn't it?
A. I send them in the office to discuss that.
Q. You sent him in the office?
A. He never went in the office.

Q. Because he always talked to you?

A. Yeah. I didn't really quote prices. That's not what I'm hired for.
Q. You quoted him the price of $200, didn't you?
A. Unh-unh. I don't remember that either.
Q. You don't remember that?

*1085 A. No, I don't.
* * * *
Q. You work on cars?
A. Well, Mr. Hayes do [sic] all the paperwork. All I do is handle wrenches.
Q. And you deal with customers primarily?
A. I tell them what's wrong with the vehicle. They get the price in the office. Okay? That's the way it goes.
(Emphasis added). As can be seen, Wilson testified that he did not normally quote prices. I believe the majority may have inferred from this that Wilson was not allowed to quote prices. However, Wilson never stated that he was unauthorized to do so, and he admitted that Stovall dealt only with him and never went to the office. Given Wilson's testimony that he quoted Stovall the initial price of $162.60, and Wilson's admission that Stovall always dealt with him when visiting the business, I believe there is significant evidence to support the conclusion that Wilson had the authority to quote prices to customers and that Wilson did in fact quote the price of two hundred dollars to Stovall.
¶ 22. Likewise, Hayes offered no testimony indicating that Wilson was forbidden from offering price quotes to customers. In fact, I cannot find anything in Hayes's testimony to indicate that mechanics at Holly Springs Tire are prohibited from giving estimates for work. Additionally, Hayes admitted that he knew nothing of what had been said between Wilson and Stovall. During his cross-examination, Hayes testified as follows:
Q. Well, let me ask you like this. When a mechanic tells you that I can fix your car and you agree upon a price and I pay the price for that car, as a consumer, I'm to believe that my car is fixed, correct?
A. Yeah, I guess you would be.
* * * *
Q. But you can understand when someone is told $200 and then they go back to pick up their car and now they're told that they have to pay over $800, wouldn't that be upsetting to you?
A. I don't know anything about the $200.
Both of these exchanges presented Hayes with an excellent opportunity to explain that Wilson lacked authority to quote prices, but he did not do so. Therefore, based on my review of the record, I believe that the evidence strongly indicates that Wilson had the authority to quote prices to customers, even if he did not ordinarily do so.
¶ 23. As to the repair of the head gasket modifying an existing contract, I find that it did not. The oral agreement, as testified to by Stovall, encompassed whatever labor it took to repair the car. No one else offered an alternate view of what was contemplated by any oral agreement between Stovall and Wilson. Furthermore, it is well established that a modification to an agreement must still comprise all of the elements necessary to form a contract in the first place. As stated by the Mississippi Supreme Court, "For a subsequent agreement to modify an existing contract, the later agreement must, itself, meet the requirements for a valid contract." Farm Servs., Inc. v. Oktibbeha County Bd. of Supervisors, 860 So.2d 804, 810(¶ 20) (Miss.2003) (citations omitted). A valid contract contains "(1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." Rotenberry v. Hooker, 864 So.2d *1086 266, 273 (¶ 25) (Miss.2003) (quoting Lanier v. State, 635 So.2d 813, 826 (Miss.1994) (overruled on other grounds)). Therefore, if there were a modification to an existing oral contract, Stovall must have assented to the modification. Even if Stovall somehow implicitly assented to a modification, an agreement must be "sufficiently definite." I fail to see how an agreement that is missing an essential element  price  can be sufficiently definite. Therefore, I cannot agree that the contract was somehow modified by the parties' actions.
¶ 24. The circuit court found that Stovall and Holly Springs Tire, in any contract between them, could not have contemplated all the charges and costs that would arise in connection with the repair of Stovall's vehicle. Assuming this to be true, how could the circuit court find that Stovall had in fact agreed to pay more than an additional six hundred dollars? I believe that Stovall never agreed to or even contemplated paying over two hundred dollars in labor cost for the repair of his car. Accordingly, I cannot find that Stovall and Holly Springs Tire initially contemplated that Stovall would agree to pay whatever price it would cost to repair, and specifically the price that Holly Springs Tire later attempted to force on Stovall.
¶ 25. Accordingly, I must dissent. I would reduce the judgment rendered in favor of Holly Springs Tire by $641.51 and enter judgment here in favor of Holly Springs Tire for $226.71, representing the labor cost of two hundred dollars, $4.88 for the manifold gasket, seven dollars for gas, and taxes in the amount of $14.83.
ROBERTS, J., joins this separate written opinion.
NOTES
[1] Hayes is the manager of Holly Springs Tire.
[2] This amount represents the two hundred dollars for labor plus $4.88 for a manifold gasket, seven dollars for gas, and $14.83 for taxes.