337 So.2d 1263 (1976)
AFFILIATED INVESTMENTS, INC.
v.
John L. TURNER et al., d/b/a John L. Turner & Associates.
No. 48832.
Supreme Court of Mississippi.
October 5, 1976.
*1264 Wells, Gerald, Brand, Watters & Cox, Frank T. Moore, Jr., Clifford C. Thompson, Jackson, for appellant.
Butler, Snow, O'Mara, Stevens & Cannada, Thomas W. Prewitt, Rhesa H. Barksdale, Jackson, for appellees.
Before ROBERTSON, BROOM and LEE, JJ.
LEE, Justice, for the Court:
John L. Turner & Associates, a partnership, filed suit in the Circuit Court of Hinds County against Affiliated Investments, Inc. for breach of contract, and judgment was entered on a jury verdict in the amount of seventy-two thousand dollars ($72,000.00). Affiliated appeals from that judgment.
The sole question here is whether or not the alleged contract is unenforceable under the Statute of Frauds [Mississippi Code Annotated § 15-3-1(d) (1972)].
During the summer of 1971, James R. Coulter was employed by Affiliated effective January 1, 1972, at which time he became vice-president of real estate with the company. Affiliated was interested in building an office condominium, and Coulter was in charge of the project. In September, 1971, prior to his full-time employment with Affiliated, he met with John L. Turner, who was selected as the architect. A six percent (6%) architect fee was agreed upon, and it was understood that the standard architect's contract would be executed after January 1, 1972, when Coulter became officially a member of the company. Turner began preliminary work on the project, to be known as Executive Towers.
George S. Sanders, Jr., president of Affiliated, wrote the City of Jackson (from whom the lot was to be acquired) on January 24, 1972, that "We are using local design talent" referring to John L. Turner & Associates. Also, he advised the City that, if there were any questions about the project, James R. Coulter, vice-president of real estate, should be contacted. Turner sent the contract to Coulter on January 11, 1972, after signing it himself, and he requested Coulter to secure the signature of Sanders (who had signed contracts with the architectural firm in other projects) on the contract and to return a copy for Turner's files. This contract was misplaced, and Coulter requested another one from Turner who executed the second contract and sent it to Coulter. After quite a delay, Coulter made changes in the document, initialed same and sent it back to Turner to initial the changes. Turner did so and returned it to Coulter on August 17, 1972. Thereupon, Coulter wrote a memorandum[1] to Sanders, stating that the contract was ready to be executed, attached it to the contract, and forwarded them to Sanders. The contract was never signed by Sanders.
In the meantime, Turner had continued work on the plans and specifications, and about July, 1972, when they were fifty percent (50%) to sixty percent (60%) complete, he, Sanders and Coulter discussed them and the project favorably at a dinner meeting. On June 30, 1972, Turner sent Coulter a bill for soil tests in the amount of twenty-one hundred ten dollars and three cents ($2,110.03), and on July 7, 1972, a bill for engineering work in the sum of two hundred forty-two dollars and forty-two cents ($242.42), which were paid by Affiliated. A rendering (projectory or picture of the building as seen in perspective rather than elevation) for publicity of the building was displayed in the main lobby of Affiliated's office for eight or nine months, and it showed John L. Turner & Associates as architects. A brochure with the same picture and name of John L. Turner & Associates *1265 was prepared by Sanders for circulation, and pictures of the building were published in the daily Clarion-Ledger and Jackson Daily News. Publication of the project was made in a professional weekly indicating that plans for the building were complete and John L. Turner & Associates were the architects. During the entire period Coulter worked in close contact with Turner and kept Sanders informed.
In late August, 1972, Affiliated decided that the project was not feasible, and terminated Coulter's employment. At that time, the plans and specifications were complete. Turner billed Affiliated for seventy-five percent (75%) of the fee, which amounted to seventy-two thousand dollars ($72,000.00) [The remaining twenty-five percent (25%) related to construction]. Sanders said there was no contract, and Affiliated declined to pay the same.
At the request of appellant, the court granted Instruction No. 5 which told the jury that appellees were required to prove by a preponderance of the evidence that a contract was agreed upon whereby appellees would furnish architectural services to appellant, and Instruction No. 9 which defined the authority of Coulter as being actual, implied, or apparent, and told the jury that, if it found from the evidence Coulter lacked actual, implied, or apparent authority to enter the alleged contract with appellees for architectural services, then the verdict must be for appellant. Thus, by its verdict, the jury found that there was a contract and that Coulter had the authority to enter into and execute the contract. The absence of an agreement and the lack of authority on the part of Coulter are not disputed by appellant on this appeal.
We now consider the question of whether or not there is some memorandum or note of the contract in writing and signed by Affiliated which will remove it from the Statute of Frauds. The applicable part of the Statute of Frauds [Mississippi Code Annotated § 15-3-1 (1972)] is as follows:
"An action shall not be brought whereby to charge a defendant or other party:
* * * * * *
(d) Upon any agreement which is not to be performed within fifteen months from the making thereof;
* * * * * *
unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing."
The minutes of the Board of Directors of Affiliated dated December 13, 1971, recited that Sanders presented to the Board for discussion plans and drawings of the condominium project and that he advised the Directors Jim Coulter would be in charge of the project; the undisputed evidence in the record shows that he was in charge of same. The minutes of said Board dated April 28, 1972, authorized the Executive Committee to take necessary steps in the execution of the architect's contract (John L. Turner & Associates). It is significant to note again that:
(1) Coulter's signature or method of authenticating a document was by his initials "JRC" or "JC".
(2) Coulter made changes in the contract forwarded to him by Turner at five different places and authenticated the changes by those initials.
(3) Coulter sent that contract to Turner who likewise initialed it and returned it to Coulter who then approved it, wrote the memorandum [Appendix I], attached it to the contract, and sent it to Sanders.
(4) Coulter testified:
"Q. When was the contract under which these services were performed made?
A. It was finalized at the time I applied my initials as far as I was personally concerned.
* * * * * *
Q. Did anyone tell you to initial that contract?

*1266 A. No. This was my way of advising my senior officer in the corporation that I had reviewed it and approved it and I was totally satisfied."
In 37 C.J.S. Frauds, Statute of § 178, at 659-661 (1943), the law is generally stated as follows:
"In order that separate writings not physically connected may be considered together for the purpose of determining their sufficiency as a memorandum, it is generally held essential that their relation or connection with each other appear on their face, in other words, the writings must contain either an express reference to each other or internal evidence of their unity, relation, or connection, sufficient to make parol evidence of their connection unnecessary. Of course, an express or explicit reference from one document to another incorporates the latter in the former so as to allow the two to be considered together for the purpose of determining whether the requirements of the statute of frauds are satisfied; but, at least where the several writings are each signed by the party to be charged, an express reference is not necessary to justify their consideration together; the connection of the writings may be implied where their contents show that they relate to the same parties and subject matter and are parts of one and the same transaction....
* * * * * *
As has already been stated in subdivision a of this section, where each of the writings is signed, express reference from one to the other need not exist, provided it appears from inspection and comparison that the writings severally relate to the same subject matter and transaction. However, it is not essential that all the writings be signed; unsigned writings may be considered together with a signed writing for the purpose of spelling out a sufficient memorandum, provided they are sufficiently connected. Various phrases have been used to describe the certainty with which such connection must be shown; thus it has been held sufficient or essential that the connection appear from internal evidence sufficient to render parol evidence thereof unnecessary; that the signed writing refer to the unsigned writings in clear and distinct terms, although not eo nomine; ..."
It is further stated at 72 Am.Jur.2d Statute of Frauds § 286, at 806 (1974):
"A memorandum may be sufficient to satisfy the statute of frauds notwithstanding the fact that it was not prepared or signed with the intent to comply with the statute, to make the contract binding, to integrate the agreement, or to furnish evidence of the contract, provided that the statute requires only a memorandum, as distinguished from a contract, in writing. A writing may constitute a sufficient memorandum or a contract notwithstanding that it contains a repudiation of the contract. However, the statute is not satisfied by a writing which recites the receipt of an offer but does not state that it is accepted or admit the contract sought to be enforced..."
Although the specific question was not before the Court in Ludke Elec. Co. v. Vicksburg Towing Co., 240 Miss. 495, 127 So.2d 851 (1961), the opinion followed the general statement of the law on this question and is applicable here:
"This Court recognizes the rule set out in Gulfport Cotton Oil, Fertilizer and Mfg. Co. v. Reneau, 94 Miss. 904, 48 So. 292, that parol testimony may be resorted to to show the situation of the parties and application of the terms used in a written memorandum, but the memorandum itself must contain all the features of the agreement, and although the memorandum may consist of more than one writing, they must be so related that the memorandum signed by the party to be charged can be held to approve the other documents in which the terms of the contract are set forth.
We agree, therefore, with appellant's premise that the written `memorandum' may consist of one or several writings, as stated in the general law. 49 Am.Jur., *1267 Statute of Frauds, Sec. 392, p. 695. The signed memorandum must, however, refer to the unsigned writing either expressly or by internal evidence of subject matter and occasion under such circumstances as to clearly show that the unsigned writing is necessarily incorporated into the signed memorandum. 49 Am. Jur., Statute of Frauds, Sec. 394, p. 699; Borden v. Case (Ala. 1960), 270 Ala. 293, 118 So.2d 751.
This is said to be the true rule and is stated in 49 Am.Jur., Statute of Frauds, Sec. 394, p. 700, as follows: `The true rule, however, imposes the condition that the signed writing must have been written with at least an implied reference to the writing which it is sought to incorporate in the memorandum; otherwise, the signature on the one instrument cannot be regarded as authenticating the other writing. Therefore, it would seem that in order for an unsigned writing not referred to expressly in a signed writing to be deemed incorporated in the signed writing, it should appear that the signed writing is based in part, at least, upon the unsigned writing.'
The Reneau case, supra, was cited under this section and our Court has clearly adopted the rule requiring that the written signed memorandum must make at least an implied reference to the other writing.
This rule is pointed out in Williston on Contracts, revised Edition, Vol. 2, Sec. 581, p. 1671, as follows: `Where some of the papers which it is sought to include are unsigned, it is sometimes said that one paper must refer to the other, or that there must be mutual reference, but this is inaccurate. What is essential is that the signature of the party to be charged shall authenticate the whole of the writing. It is, therefore, necessary to incorporate all the documents into a writing signed by him. It will not be enough to incorporate all into an unsigned writing, or into a writing signed by the plaintiff and, consequently, it is insufficient and immaterial that such a writing refers to a writing signed by the defendant. What is necessary, then, is that a writing so signed refer to all writings not so signed that are sought to be made a part of the memorandum.
`It is not important in what language reference is made; it is certainly enough if a plain reference is made by a document signed by the party to be charged, whatever its nature, to any other writing.'
There is a considerable difference between a written contract and a written memorandum of an oral contract. The requirement of the Statute of Frauds is met, when a written memorandum has been made by the party to be charged at any time before the action is brought. A written contract is the only evidence admissible to show its content, but parol evidence may be admitted to show that the memorandum of a parol contract is inadequate, or inaccurate, and hence does not comply with the statute. There must be a valid oral contract, of which the memorandum is a written statement, and the memorandum must be complete within itself, and cannot be added to or eked but by oral testimony." 240 Miss. at 501-502, 127 So.2d at 854-855.
When Coulter initialed the contract, and when he later wrote and signed a memorandum expressly referring to the contract, he authenticated same or attested to the genuineness thereof, and such action satisfied the Statute of Frauds. This is true even though he sent the contract to Sanders for his signature. A corporation can act only through its agents, and, as stated supra, the jury found that Coulter had the authority to execute (authenticate) the contract.
Appellant contends that even though the writing may be complete and satisfies the Statute of Frauds, it is not sufficient unless it has been delivered, and it cites Johnson v. Brook, 31 Miss. 17 (1856); Jelks v. Barrett, 52 Miss. 315 (1876); Osler v. Atlas Assur. Co., 127 Miss. 511, 90 So. 185 (1922), and Howie v. Swaggard, 142 Miss. 409, 107 So. 556 (1926).
*1268 The first three cases involve conveyances of land, the fourth involves a conveyance of timber, and they may be distinguished from the case here. However, Coulter testified that when he initialed the contract it was finalized. He sent that instrument to Turner, who applied his initials to it, and such action on the part of Coulter amounted to a delivery of the contract, regardless of the fact that Turner returned it to Coulter.
It is further contended by appellant that, even though appellees performed seventy-five percent (75%) of the contract, a part performance will not remove the contract from the Statute of Frauds. With this contention we agree, but the action and conduct of appellant through its President Sanders, its Vice-President in charge of the project Coulter, and the entries on its minutes during the performance of the contract by appellees were tantamount to a ratification of the contract.
Appellant had used appellees on previous projects, it was satisfied with their services, and it was satisfied with the services performed by them on the Executive Towers project. Doubtless, had the project continued to completion, no disagreement would have arisen between appellant and appellees as to their respective obligations under the contract.
For the reasons stated, this case must be and is affirmed.
AFFIRMED.
PATTERSON and INZER, P. JJ., and SMITH, ROBERTSON, WALKER and BROOM, JJ., concur.
GILLESPIE, C.J., and SUGG, J., took no part in this decision.

APPENDIX I
"Mr. Sanders:
As we have now tied up the land, I believe we are ready to execute the attached.
 J.C."
NOTES
[1] See Appendix I.