BARNES, J.,
for the Court.
¶ 1. This case involves a contractual dispute over the sale of the “Heritage Building” in downtown Jackson, Mississippi. The sellers are The Heritage Building Property, LLC; Jenkins Heritage, LLC; and Elverton Investments, LLC (collectively, the “Sellers”). The buyers are Prime Income Asset Management, Inc. and TCI Heritage Building, Inc. (collectively, the “Buyers”). Following the failure to consummate the sale of the building, a dispute arose as to whether the Buyers were entitled to the return of a $100,000 deposit they had placed in escrow. The escrow agent, Chicago Title Insurance Company (“Chicago Title”), subsequently filed an interpleader action in the Chancery Court of Rankin County against the Buyers and the Sellers.[1] After the Sellers filed a motion for summary judgment and the Buyers filed a cross-motion for summary judgment, the chancery court ruled in favor of the Buyers and ordered the return of the $100,000 escrow deposit to them, less $4,732.50 costs and attorneys’ fees for Chicago Title, for a total of $95,267.50.
¶ 2. From this judgment, the Sellers now appeal. We find the chancery court erred in granting summary judgment in favor of the Buyers. We reverse and render judgment in favor of the Sellers, awarding them $95,267.50 as liquidated damages.
STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 3. Counsel for Sellers and Buyers agreed to a “Stipulation of Undisputed Facts” in the chancery court, as follows:[2]
1. On September 12, 2007, the Sellers entered into a Purchase and Sales Agreement with ... Buyers for the purchase of “The Heritage Building.”
2. Pursuant to the Agreement, the Buyers were required to forward $100,000 into an Escrow Deposit with Chicago Title.[3] The Buyers did not forward the deposit in the time required under the Agreement, resulting in a lapse of the Agreement. However, [the Buyers] informed the Sellers that they were still interested in purchasing the property. As such, the parties signed a Reinstatement and First Amendment to Purchase Agreement (“First Amendment”^[4]] on September 21, 2007. On that same date, the Buyers wire-transferred the required $100,000 Escrow Deposit to [Chicago Title].
3. Under the original Agreement (and not changed under the First Amendment), the Buyers had the right to terminate the contract on or before the expiration of the “Inspection Period,” *1141 scheduled to end at 5:00 p.ra. ... on October 10, 2007. The Agreement specifically states “In the event that Buyer does not deliver any notice during the Inspection Period (notice to proceed or notice of cancellation), Buyer shall be deemed to have timely cancelled this Agreement.”
4. On [October 10, 2007], Garry Gibbons, [on behalf of the Buyers] informed Breck Hines, an agent of the Sellers, that the Buyers wanted to proceed but needed an additional amendment regarding extending the deadline for the Buyers to perform a title and survey review, and for assumption of financing. The Sellers subsequently agreed to the requested terms, and their counsel drafted and circulated the proposed Second Amendment via email at 3:S0 p.m.
5. Counsel for the Buyers forwarded the [Second Amendment] to the Buyers for signature. Steven Shelley, the representative for the Buyers, signed the Second Amendment and returned [it] to the Sellers via email at 4:25 p.m.
6. Breck Hines obtained the signature of Ted Duckworth, on behalf of The Heritage Building Property, LLC, on the Second Amendment. At 4:41 p.m., Breck Hines sent a copy of the Second Amendment, which was signed by Ted Duckworth back to Steve Shelley and others via email. In his email, Breck Hines gave the Buyers written confirmation that the other two Sellers had verbally agreed to the extension, but that they were out of state and that it could be the next day before they signed it.
7. The Second Amendment, signed by the Buyer and one Seller, stated that “the Inspection Period has expired” and the Buyer has “no further right to terminate the Agreement....”[5]
8. Prior to 5:00 p.m., Jeff Agrest, counsel for the Buyers, had a telephone conversation with Dru Luckett, a paralegal in the offices of counsel for Sellers, asking her to “trash” the Second Amendment, stating he wanted to “further modify it.” [At 4:55 p.m., an email from Dru Luckett to Jeff Agrest, with Breck Hines and Steve Hendrix copied, confirmed this conversation and request.]
9. At 5:14 p.m., [Jeff Agrest] forwarded a “Revised” Second Amendment to Dru Luckett via email. In his email, he noted that the Buyers were requesting that the Inspection Period be extended, and in the alternative-if the Inspection Period could not be extended, his email should “serve as a termination notice.”
10. Negotiations for the purchase of the Heritage Building continued between the Parties until Garry Gibbons finally informed Breck Hines on November 1, 2007, that the Buyers no longer intended to go through with the purchase.
11. The proposed Second Amendment was not signed by the remaining two Sellers prior to the Buyers making their request to “trash.”
¶ 4. A dispute then ensued between the parties over who was entitled to the $100,000 escrow deposit. The Sellers claimed they were entitled to it as liquidated damages under the Agreement. The Buyers stated it should be returned to them pursuant to their rights of termination found in the Agreement. Subsequently, Chicago Title filed an interpleader action against the Buyers and Sellers in the Chancery Court of Rankin County. Both the Sellers and the Buyers filed mo *1142 tions for summary judgment. The chancery court entered an agreed order whereby Chicago Title was discharged from liability and the escrow funds were deposited with the court. The parties also stipulated that Chicago Title was entitled to $4,732.50 for costs and attorneys’ fees.
¶ 5. Following a hearing on the motions for summary judgment, on July 25, 2008, the chancellor entered an order dismissing the Sellers’ motion for summary judgment and granting the Buyers’ cross-motion for summary judgment. The chancellor ordered return of the $100,000 escrow deposit to the Buyers, less Chicago Title’s costs and attorneys’ fees of $4,732.50. The Sellers timely appealed, raising two issues: whether the trial court erred in finding that: (1) the Second Amendment was not binding on the parties, and (2) the Buyers did not give “notice of intention to proceed” with the purchase of the Heritage Building under the original Agreement.
STANDARD OF REVIEW
¶ 6. This Court reviews a trial court’s grant of summary judgment de novo. Bullard v. Guardian Life Ins. Co. of Am., 941 So.2d 812, 814 (¶ 6) (Miss.2006) (citing Stephens v. Equitable Life Assurance Society, 850 So.2d 78, 82 (¶ 10) (Miss.2003)). Summary judgment is proper “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” M.R.C.P. 56(c). Since the parties agree that the facts in this case are undisputed, the inquiry is solely a question of law.
ANALYSIS
¶ 7. The chancellor ruled that because not all of the Sellers had signed the Second Amendment to the Agreement, it was not binding on either the Sellers or the Buyers before the expiration of the Inspection Period. Further, as the Buyers did not provide written notice to proceed or cancel the contract prior to expiration of the Inspection Period, the chancellor determined that the Buyers timely cancelled the original Agreement.
¶ 8. The Sellers focus their argument on whether the Buyers could revoke their assent to the Second Amendment. The Sellers argue even if the Buyers could revoke their assent, and the Second Amendment was not effective, the original Agreement was still in effect because the Buyers gave notice to proceed before and after the Inspection Period. Accordingly, the Sellers claim they are entitled to the escrow deposit as liquidated damages because the Buyers breached the Agreement by not going forward with the purchase of the property. Finding the first issue disposi-tive, we decline to address the second.

Enforceability of the Agreement’s Second Amendment

¶ 9. It is undisputed that the original Agreement became a contract between the Buyers and the Sellers on September 12, 2007. On October 10, 2007, at the Buyers’ request, the Sellers’ counsel drafted a proposed Second Amendment, which clearly stated that upon execution of amendment, the Buyers acknowledged that the Inspection Period had expired and that they had no further right to terminate the Agreement. Shelley first signed the Second Amendment as a representative for the Buyers and returned it to the Sellers via email at 4:25 p.m. Only one of the three Sellers, Duckworth, was able to print out and sign the Second Amendment prior to 5:00 p.m., as the other Sellers were out of state. However, Hines, as agent for the Sellers, communicated to the Buyers, by email, that the other two Sellers had verbally agreed to the Second Amendment, *1143 and that they would sign it the following day. Then, at 4:55 p.m., counsel for the Buyers contacted the paralegal for the Sellers, and told her to “trash” the Second Amendment.
¶ 10. It is well established that contracts may be modified by a subsequent agreement between the parties. Kelso v. McGowan, 604 So.2d 726, 731 (Miss.1992) (citing 3 A. Corbin, Contracts § 574 at 373-75 (I960)). However, “[f]or a subsequent agreement to modify the original contract, the subsequent agreement itself must meet the requirements for a valid contract.” Singing River Mall Co. v. Mark Fields, Inc., 599 So.2d 938, 947 (Miss.1992). A valid, enforceable contract requires an offer, acceptance of the offer, and consideration. Serv. Elec. Supply Co., Inc. v. Hazlehurst Lumber Co., 932 So.2d 863, 869 (¶ 17) (Miss.Ct.App.2006) (citing Krebs v. Strange, 419 So.2d 178, 181 (Miss.1982)). It is elemental that “a contract is not formed until the offeree accepts the terms stated by the offeror.” Vice v. Hinton, 811 So.2d 335, 338 (¶ 12) (Miss.Ct.App. 2001) (citing Edwards v. Wurster Oil Co., 688 So.2d 772, 775 (Miss.1997)). Under Mississippi law, when a person creates a power of acceptance in another party by signing a contract, that person retains the power to revoke simply by giving notice to the other party. Id. at (¶ 14). The revocation must, however, “be communicated to the offeree before he or she has accepted. If the offer is accepted before withdrawal, it becomes a binding contract and cannot be withdrawn.” 17A Am.Jur.2d Contracts § 60 (2004).
¶ 11. In the instant case, both parties agree that the Buyers’ tender of the signed Second Amendment constituted an offer to the Sellers. The “$100,000 question” is whether that offer was revoked prior to acceptance by the Sellers. We think not. “Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances.” Restatement (Second) of Contracts § 30(2) (1981). In this case, one Seller, Duckworth, manifested assent the afternoon of October 10, when he signed and returned the document to Hines. The other two Sellers verbally assented, and an email to that effect was sent by the Sellers’ agent, Hines, with a copy of the Second Amendment signed by Duckworth, to the Buyers at 4:41 p.m. It was only after that assent had been communicated to the Buyers that the Buyers attempted to revoke their offer. By that time, we find it was too late.
¶ 12. The Buyers contend that all of the Sellers had to sign the Second Amendment in order to bind the Buyers. The Sellers argue that the Buyers’ right to revoke the offer ended once the first Seller signed the Second Amendment even without acceptance by the other two Sellers, but the document “became effective” upon the signing by the remaining Sellers. We cannot agree with either of these propositions as stated.
¶ 13. In Turney v. Marion County Board of Education, 481 So.2d 770, 774 (Miss.1985), the Mississippi Supreme Court discussed 17 C.J.S. Contracts § 62 (1963) as providing a “comprehensive discussion of the law on signature requirement”:
[Signature is not always essential to the binding force of an agreement, and whether a writing constitutes a binding contract even though it is not signed or whether the signing of the instrument is a condition precedent to its becoming a binding contract usually depends on the intention of the parties. The object of a signature is to show mutuality or assent, but these facts may be shown in other *1144 ways, as, for example, by the acts or conduct of the parties.
[[Image here]]
The question as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument. The reason for holding the instrument void is that if was intended that all the parties should execute it and that each executes it on the implied condition that it is to be executed by the others, and, therefore, that until executed by all it is inchoate and incomplete and never takes effect as a valid contract, and this is especially true where the agreement expressly provides, or its manifest intent is, that it is not to be binding until signed.
(Emphasis added). The court found the “common thread” running though these passages to be “the intent of the parties. Whether an unsigned writing constitutes a binding contract depends upon the intention of the parties.” Id. (finding lessee who declined to execute lease lacked intent to be bound to the terms of lease he later claimed to be valid).
¶ 14. In Skinner v. Haugseth, 426 So.2d 1127, 1130 (Fla.Dist.Ct.App.1983), the Florida Second District Court of Appeal continued quoting from the C.J.S. where the Mississippi Supreme Court left off:
Where these reasons do not apply, it is usually held that a party who signs and delivers an instrument is bound by the obligations therein assumed, although it is not executed by all the parties named in it, as, for example, where all the parties recognize the validity of the contract and acquiesce in its performance. Usually, however, a party may, on signing, impose an enforceable condition that the agreement is not to be binding until signed by others.
(Quoting 17 C.J.S. Contracts § 62 (1963)) (emphasis added). The Florida court found the “common thread of reasoning” in the cases cited as authority for this later passage to be “whether the signing party manifested the intent not to be bound by the contract unless all of the other parties joined in its execution.” Id. at 1130. The Florida court examined, for example, Palman v. Reynolds, 310 Mich. 35, 16 N.W.2d 657, 659 (1944), wherein the Michigan Supreme Court noted that a signing party “has the burden of showing that he did not intend to be bound unless the contract was fully executed by all of the other parties” and “quoted with approval” an earlier case which held that if the signing party “does not intend to be bound he has to declare his intentions at that time rather than simply testifying to this effect at a later date.” Skinner, 426 So.2d at 1131. The Skinner court thus held that:
[A] contract not signed by all of the parties, but otherwise valid, may be upheld against a signing party, unless the nature or wording of the contract indicates that his signature was conditioned upon all other parties signing the contract, or he can prove by parol evidence that when he signed the contract he made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties signed it.

Id.

¶ 15. To similar effect is International Creative Management, Inc. v. D & R Entertainment Co., 670 N.E.2d 1305, 1310-11 (Ind.Ct.App.1996), cited by the Sellers:
In situations where fewer than all the proposed parties execute the document we look to the intent of the parties as determined by the language of the contract to determine who may be liable under the agreement. It should be assumed that all the parties who sign the *1145 agreement are bound by it unless it affirmatively appears that they did not intend to be bound unless others also signed.
¶ 16. The Buyers do not dispute this authority but claim that the Second Amendment itself evidences that the signatures of all Sellers were necessary in order to bind the Buyers since signature lines were provided for each of the Sellers and since paragraph 8 of the Second Amendment provided for telecopied or PDF signatures to be used in the place of original signatures in order to expedite execution of the document. We cannot interpret these provisions as “expressly provid[ing] ... or manifesting] intent” that the Buyers would not be bound unless and until all of the Sellers had signed the Second Amendment. Further, the modification and waiver provisions of the original Agreement state that no modification shall be valid unless it is “in writing and signed by the party against whom the enforcement ... is sought.” This provision clearly anticipates that a modification which is executed by fewer than all of the parties will be valid so long as it is signed by the party to be charged.
¶ 17. In this case, one Seller manifested assent to the Second Amendment on the afternoon of October 10, when he signed and returned the document to Hines. The two Sellers who did not sign the Second Amendment gave their verbal assent to Hines, who communicated that assent to the Buyers via email. This written acknowledgment of assent by Hines, as agent for the Sellers, is sufficient to show the Sellers’ assent to the Second Amendment and to prevent subsequent revocation of the offer by the Buyers.
¶ 18. We acknowledge that the Second Amendment may not have been enforceable against the two non-signing Sellers at that point. The Mississippi Statute of Frauds, section 15-3-l(e) of the Mississippi Code Annotated (Rev.2003), states that “[a]n action shall not be brought whereby to charge a defendant or other party ... upon any contract for the sale of lands ... unless ... the promise or agreement upon which such action may be brought ... shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing.” (Emphasis added.) While the parties stipulated that Hines was “agent” for the Sellers, and this is, we find, sufficient for him to communicate the Seller’s acceptance, the record is silent as to whether he had written authority to bind the Sellers under the statute of frauds. Therefore, if enforceability of the contract against the Sellers, rather than manifestation of their assent, were the issue before us, we would remand the case for fact finding as to whether Hines had written authority to bind the Sellers. See Affiliated Invs., Inc. v. Turner, 337 So.2d 1263 (Miss.1976) (it was a jury question whether corporation’s vice president had authority to bind corporation and satisfy statute of frauds when he, and not the president, initialed the contract).
¶ 19. However, the statute of frauds “does not make a contract void” or prevent the contract from being formed. Rather, the statute “only allows the defense to its enforcement which defense is personal to the defendant.” Davis v. Stegall, 246 Miss. 593, 598, 151 So.2d 813, 815 (1963). Further, it is long established that compliance with the statute is sufficient if only “the party charged” shall have signed the agreement, whether the other party signed it or not. Marqueze v. Caldwell, 48 Miss. 23, 31 (1873) (tracking interpretation of the statute of frauds from English common law to conclude that trustee who held land in trust could compel specific per *1146 formance by purchaser although trustee had not signed the agreement). In the case before us, the Second Amendment was signed by the Buyers, the parties “charged” in this action; the statute of frauds does not require that the Sellers had to sign the document in order to enforce it, much less that they had to sign it in order to manifest assent to its terms.
CONCLUSION
¶ 20. The Buyers’ written offer to enter into the Second Amendment was accepted by each of the Sellers prior to the Buyers’ attempt to revoke their offer; thus, the Second Amendment became enforceable against the Buyers who breached the Agreement by refusing to purchase the Heritage Building. The remedy for this breach is payment of escrow deposit as liquidated damages to the Sellers. Accordingly, we reverse the judgment of the chancery court and render judgment in favor of the Sellers, awarding the Sellers the remaining escrow deposit of $95,267.50 in liquidated damages for breach of contract pursuant to the Agreement.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS REVERSED AND RENDERED. JUDGMENT IN THE AMOUNT OF $95,267.50 IS ENTERED IN FAVOR OF THE APPELLANTS. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS, AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. The chancery court entered an agreed order before its grant of summary judgment, discharging Chicago Title of any claims, demands, or liability as escrow agent, and ordering it to deposit the $100,000 escrow funds with the chancery court.

. Footnotes of the parties in the stipulation are omitted as they add nothing of import to this opinion; bracketed materials are inserted by the Court.

. The Agreement explained that the $100,000 escrow deposit would serve as liquidated damages for the Sellers in the event the Buyers breached the contract. Also included in the Agreement was the following statement about modification and waiver: "Except as expressly contemplated herein, no modification, waiver, supplement or discharge of this Agreement shall be valid unless the same is in writing and signed by the party against whom the enforcement is sought.”

.The changes made by the First Amendment deleted references to a "non-refundable deposit” in the Agreement, making the full $100,000 escrow deposit either refundable to the Buyers, kept by the Sellers as liquidated damages, or used toward the purchase price of the subject property.

. The Second Amendment stated: "Upon execution of this Amendment, Buyer acknowledges that the Inspection Period has expired and Buyer shall have no further right to terminate the Agreement...."