ISHEE, J.,
for the Court:
¶ 1. DC General Contractors Inc. contracted with Slay Steel Inc. for the fabrication of steel for a construction project that was ultimately abandoned. Slay Steel filed a breach-of-contraet suit seeking to recover $165,000 for its losses on materials purchased for the project and lost profits. A jury trial was held. The jury found in favor of Slay Steel and awarded $41,500 in damages.
¶2. DC General appeals, asserting the parties agreed to a contract modification that released DC General from liability. Slay Steel cross-appeals requesting an ad-ditur. It asserts the jury’s verdict of $41,500 was an impermissible compromise verdict. We affirm on both the appeal and cross-appeal.
FACTS AND PROCEDURAL HISTORY
¶ 3. DC General, a general contractor, was hired to oversee the construction of a Big Buck Sports retail store in Hatties-burg, Mississippi. On January 15, 2008, DC General contracted with Slay Steel for the fabrication of structural steel for the store. Slay Steel agreed to cut and fabricate the steel in preparation for construction. The purchase order was for $936,830. Big Buck Sports’ owners had *580 trouble financing the store, and the construction was delayed. However, Slay Steel had already begun purchasing materials, as the price quoted in the purchase order was based on the then-current market price of steel.
¶ 4. On May 13, 2008, when no progress had been made by Big Buck Sports, Slay Steel invoiced DC General $289,819.90 for materials Slay Steel had purchased and stored in anticipation of construction starting. DC General forwarded the invoice to Big Buck Sports’ owners with an attached letter stating: “We need to pay for these materials as soon as possible.” Big Buck Sports’ owners replied that they did not want to commit funds to hold the inventory, and the invoice went unpaid. Through subsequent letters exchanged by the parties, Slay Steel was given permission to “utilize this material on other projects as needed,” since it was unclear when the project would start. However, Slay Steel proposed that the contract price would need to be renegotiated if this was done. DC General responded, “we will evaluate steel costs to replace the steel you use and adjust our pricing at that point.” Slay Steel used or sold the materials as it was able. Ultimately, Big Buck Sports failed to obtain financing and cancelled its contract with DC General. DC General paid Slay Steel $60,000 for shop drawings, but this was the only payment Slay Steel received. This amount is separate from the $289,819.90 requested for materials.
¶ 5. Slay Steel sought compensation from DC General for its losses. DC General refused. On January 14, 2010, Slay Steel filed a breach-of-contract suit in the Lauderdale County Circuit Court. A trial was held, consisting of testimony by Greg Slay, vice president of Slay Steel, and Dorian Shoemake, owner of DC General.
¶ 6. At trial, Slay Steel argued DC General breached the contract by failing to specify a delivery date for the fabricated steel in a timely manner. DC General moved for a directed verdict at the end of Slay Steel’s ease-in-chief and again at the close of all evidence. In its motions, DC General argued that it was not liable to Slay Steel for breach of contract because the subsequent letters exchanged by the parties served to modify the contract upon the decision by Big Buck Sports’ owners not to proceed with construction of the store. The motions were denied. The jury returned a verdict in favor of Slay Steel for $41,500. DC General moved for an additur, a judgment notwithstanding the verdict, or, in the alternative, a new trial. All three motions were denied. DC General now appeals arguing the trial court erred in denying its motion for a directed verdict. Slay Steel cross-appeals arguing the trial court erred in denying its motion for an additur or, in the alternative, a new trial on damages.
STANDARD OF REVIEW
¶ 7. The denial of a motion for a directed verdict or JNOV is reviewed de novo. White v. Stewman, 932 So.2d 27, 32 (¶ 10) (Miss.2006). The criteria for review are as follows:
This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferenee[s] that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable [jurors] could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand[,] if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. *581 The above standards of review, however, are predicated on the fact that the trial judge applied the correct law.
Solanki v. Ervin, 21 So.3d 552, 557 (¶ 10) (Miss.2009) (quoting Ala. Great S. R.R. v. Lee, 826 So.2d 1232, 1235-36 (¶ 12), 826 So.2d 1232 (Miss.2002)). In other words, we must consider “whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” White, 932 So.2d at 32 (¶ 11).
¶ 8. The denial of an additur is reviewed for abuse of discretion. Thompson v. Nguyen, 86 So.3d 232, 237 (¶ 18) (Miss.2012).
DISCUSSION
I. DENIAL OF MOTION FOR A DIRECTED VERDICT
¶ 9. DC General argues it was entitled to a directed verdict because the two letters exchanged by the parties modified the contract such that it was not liable for Slay Steel’s losses once the project was abandoned by Big Buck Sports’ owners.
¶ 10. “It is well established that contracts may be modified by a subsequent agreement between the parties.” Heritage Bldg. Prop., LLC, v. Prime Income Asset Mgmt., Inc., 43 So.3d 1138, 1143 (¶ 10) (Miss.Ct.App.2009) (citing Kelso v. McGowan, 604 So.2d 726, 731 (Miss.1992)). “For a subsequent agreement to modify an existing contract, the later agreement must, itself, meet the requirements for a valid contract.” Singing River Mall Co. v. Mark Fields, Inc., 599 So.2d 938, 947 (Miss.1992). A valid contract requires an offer and acceptance. Heritage Bldg. Prop., 43 So.3d at 1143 (¶ 10). “Failure to communicate acceptance of an offer is fatal to [the] creation of a valid contract.” Anderton v. Bus. Aircraft, Inc., 650 So.2d 473, 476 (Miss.1995) (citing R.C. Constr. Co., Inc. v. Nat’l Office Sys., Inc., 622 So.2d 1253, 1255 (Miss.1993)). An agreement modifying a contract does not need consideration to be binding. Miss.Code Ann. § 75-2-209(1) (Rev.2002).
¶ 11. The contract that is the subject of this action is the January 15, 2008 purchase order for the fabrication of steel. The purchase order states that Slay Steel will “effect complete delivery [of the fabricated steel] to the job site by TBD with partial deliveries as required by job progress .... ”
¶ 12. On June 25, 2008, when no delivery date had been determined, Slay Steel sent DC General’s manager, Ken Taylor, the following letter:
Dear Ken,
As you know, I received a purchase order on Big [B]uck on January 15, 2008. With this in hand, I immediately bought all of the major steel members on this project. I took delivery of it and stored it on my yard with a preliminary delivery date of June-July in mind. To date, we have not even begun fabrication. To date, I have spent $321,042.41 just on material. All of this material is bought and paid for. We did this for two reasons: #1: to be protected from the ongoing price increases. #2: to have the material readily available for fabrication since there are shortages in the market. On May 13, 2008, I invoiced you for $298,819.00 worth of material. Since that date, I have took [sic] delivery of another $22,223.41 worth of material that was placed in rollings. I also invoiced for $40,000.00 worth of [detailing for [s]hop [drawings. To date, we have not received payment on anything.
This morning, we received an increase from [Slay Steel’s supplier]. Our pur *582 chase order was sent to [Slay Steel’s supplier] on January 15, 2008. At that point, they agreed to hold their price if the job shipped within 20 weeks of that date. We are now in week 22. Their increase is $64,113.00. This will have to be passed on to the owner[s].
In recent phone calls & visits, [the project manager] tells me that the owners are still discussing financing. With that in mind, I have prepared a spreadsheet for you showing what we paid for material versus today[’]s pricing. This will show the owners their savings on material, at my expense.
With all of the above in mind, I need to receive payment on the May invoice. If this is not possible, then we need to sale [sic] the material. I cannot afford to keep carrying this much inventory. I hope that the attached spreadsheet will help the owner[s] make up their minds. I assure you that the $157,380.77 is the minimum that the increase will be that they incur. It is based on 6-25-2008 pricing. We are receiving base price increases at a minimum of once a month. We have 306.25 tons on our yard for Big Buck. A one cent per pound increase will cost the owner[s] $6,125.07 every time it goes up. This pricing does not include ANY surcharges. This is published base price only.
Please let me know something as soon as possible[,] Ken. I know this is sort of out of your hands, but if the owner[s] choose[] option two mentioned above, then it may be that I can go on and use some of the material on some work that we are currently doing. If this is done, then we would have to re[-]price the entire job whenever they are ready to proceed.
Sincerely,
Slay Steel, Inc.
On July 10, 2008, DC General responded to Slay Steel’s letter:
Greg:
We have discussed the steel situation on the referenced project with the Owners. At this time, they do not want to commit any funds to holding the steel inventory. You can utilize this material on other projects as needed.
We do still consider this a viable project. As with all retail projects, store opening times are tuned to the seasons and the Owners try to plan construction to coincide. Once we receive notice to proceed on this project, we will evaluate steel costs to replace the steel you use and adjust our pricing at that point. We appreciate your working with us on this project and will keep you updated on its status.
Sincerely,
Ken Taylor
¶ 13. Since the purchase order left the date for delivery to be determined, we must first look to Mississippi Code Annotated section 75-2-311 (Rev.2002), which instructs us on contracts that leave a term unspecified. When a contract leaves a particular aspect of performance open, the term may be made later, as long as it is “made in good faith and within limits set by commercial reasonableness.” Miss. Code Ann. § 75-2-311(1). If the specification is one that materially affects the other party’s performance, it must be “seasonably made.” Miss.Code Ann. § 75-2-311(3). Greg testified that the typical time from purchase order to delivery is ten to twelve weeks. This testimony was not contradicted. Five months passed before Slay Steel’s first letter to DC General, and no delivery date was ever determined because the project was cancelled. Thus, taking Greg’s testimony as true, it follows that DC General was in breach for failure to specify a delivery date. DC General *583 does not dispute on appeal that it was in breach of the purchase order. Its sole issue is whether or not the two letters sent subsequent to the purchase order effected a contract modification that extended the time for performance.
¶ 14. DC General’s argument regarding modification focuses on one particular issue in the two letters — the statement that the parties would re-price the job once Big Buck Sports’ owners decided to move forward. Slay Steel’s letter requests permission to use or sell the materials it had purchased if payment was not possible. But, it goes on to state, if the materials were used or sold, the parties “would have to re[-]price the entire job whenever [Big Buck Sports’ owners were] ready to proceed.” DC General gave Slay Steel permission to “utilize this material on other projects as needed.” As to re-pricing the job, DC General’s letter states: “Once we receive notice to proceed on this project, we will evaluate steel costs to replace the steel you use and adjust our pricing at that point.” DC General argues these statements formed a clear agreement that no further action was required unless the Big Buck Sports project moved forward. Worded differently, DC General argues the modification created a contingency contract, where the parties’ obligations to one another were contingent on two factors: (1) the project moving forward, and (2) an agreement on a renegotiated price. It asserts no reasonable juror could have found that this was not a contract modification; thus, it was entitled to a directed verdict.
¶ 15. Contract modification is a question of fact for the jury. Green v. Pendergraft, 253 Miss. 891, 901, 179 So.2d 831, 836 (1965). In order to reverse and render the jury’s decision, the facts must “point so overwhelmingly in favor of the appellant that reasonable [jurors] could not have arrived at a contrary verdict.” Solanki, 21 So.3d at 557 (¶ 10) (citation omitted). Further, when reviewing the denial of a directed verdict, we must consider the evidence in the light most favorable to the nonmoving party. Id. Considering the evidence in the light most favorable to Slay Steel, we cannot find that the facts so overwhelmingly favored DC General such that no reasonable juror could have arrived at a contrary decision. Slay Steel received permission from DC General to use the materials on other projects. However, no other agreement was made. Slay Steel asked to re-price the entire project, but DC General’s response only stated that it would re-price any material Slay Steel used. This language did not release DC General from liability, and it does not mention what would happen if the project did not move forward. In fact, DC General’s letter does not indicate any doubt as to the construction going forward; rather, it states the project was still considered “viable.”
¶ 16. The letters, at the least, raise a jury question as to whether the contract had been breached or modified. The burden was on DC General to show a contract modification, and we find the evidence was insufficient to support a directed verdict. The jury weighed the evidence and found Slay Steel presented more credible evidence than DC General. Viewing the evidence in the light most favorable to Slay Steel, we find substantial evidence existed to support the jury’s verdict. This issue is without merit.
II. CROSS-APPEAL
A. ADDITUR
¶ 17. Slay Steel cross-appeals arguing the trial court erred in denying its motion for an additur or, alternatively, a new trial on damages. Slay Steel argues it present *584 ed uncontradicted evidence to support an award of $165,068.82, rather than the jury’s award of $41,500, and the trial court had a duty to correct the verdict to conform to the evidence.
¶ 18. An additur may be awarded when (1) “the damages are ... inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion,” or (2) “the damages awarded were contrary to the overwhelming weight of credible evidence.” Miss. Code Ann. § 11-1-55 (Rev.2002). In determining whether the jury was influenced by bias, passion, or prejudice, our focus is on whether the verdict is so “inadequate as to shock the conscience.... ” Walker v. Gann, 955 So.2d 920, 931-32 (¶ 38) (Miss.Ct.App.2007) (quoting Wal-Mart Stores, Inc. v. Johnson, 807 So.2d 382, 392 (¶ 27) (Miss.2001)).
¶ 19. Our standard of review for a denial of an additur is abuse of discretion. Thompson, 86 So.3d at 237 (¶ 18). Our review is limited to the trial judge’s decision to deny the motion for an additur, not the jury’s action in awarding damages. McClatchy Planting Co. v. Harris, 807 So.2d 1266, 1270 (¶ 16) (Miss.Ct.App.2001) (citing McNair Transp., Inc. v. Crosby, 375 So.2d 985, 986 (Miss.1979)). The evidence is viewed in the light most favorable to the nonmoving party, giving “him or her the benefit of all favorable inferences reasonably drawn therefrom,” Id. “If that evidence is contradicted, we will defer to the jury, which determines the weight and worth of testimony and the credibility of the witness at trial.” Scott Prather Trucking, Inc. v. Clay, 821 So.2d 819, 821-22 (¶ 10) (Miss.2002) (internal quotation omitted). The jury’s award of damages will be taken as conclusive if it is “not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible, or unreasonable.... ” A & F Props., LLC v. Lake Caroline, Inc., 775 So.2d 1276, 1282 (¶ 17) (Miss.Ct.App.2000) (quoting Lucedale Veneer Co. v. Rogers, 211 Miss. 613, 635, 53 So.2d 69, 75 (1951)).
¶ 20. Slay Steel purchased approximately $321,042 in materials in anticipation of construction starting on Big Buck Sports. When it became evident the project had been delayed indefinitely, Slay Steel sought to use the materials on other projects or sell the materials to other companies. However, because the price of steel had dropped significantly, Slay Steel took a loss on all of the materials it sold. Further, it was difficult to resell the materials, as they had been specially cut for Big Buck Sports. According to charts submitted by Slay Steel at trial, it paid $172,890.06 for the materials it was able to resell; however, it was only able to resell the materials for $91,896.24, resulting in a loss of $80,993.82. The remaining materials, which Slay Steel purchased for approximately $150,000 to $200,000, were used by Slay Steel on other projects. Slay Steel is not claiming a loss for these materials. Regarding the calculation of lost profits, Greg testified he would have made a ten percent profit on the contract. The lost profit was calculated to be $84,075. Slay Steel asserts the amounts presented— $80,993.82 in costs and $84,075 in lost profits — were uncontradicted, and the jury should have awarded the total amount, $165,068.82, in damages.
¶ 21. Despite Slay Steel’s argument to the contrary, DC General did attempt to dispute the amount of damages presented by Slay Steel at trial. DC General asserted that, based on Slay Steel’s own figures, the damages were, at the most, $29,146. DC General took the total price paid by Slay Steel for materials and subtracted the prices of sales to other companies. It then subtracted the approximate purchase price *585 of the materials used by Slay Steel in its own business ($321,042-$91,896.24-$200,000 = $29,145.76). When questioned on cross-examination as to whether or not this formula was correct, Greg responded, “if the $200,000 is correct, then you’d be right, but ... that was a guess....” Greg admitted that, at some point, he stopped keeping records of the materials Slay Steel reused on other projects. DC General also questioned Greg as to why it appeared some materials were listed as being sold twice. Greg explained that he intended to use some of the materials that were later sold to other companies. However, he testified that all the numbers presented to the jury were correct.
¶ 22. DC General also challenged the alleged lost profits. Slay Steel determined its lost profits by anticipating an approximate ten percent return on the job. This was lowered to approximately eight percent at some point, but, at trial, Greg testified that Slay Steel was asking for the full ten percent due to the length of time that had passed without compensation. However, it is unclear how this number was calculated. Ten percent of the contract price would have been $93,683, yet Slay Steel has continually stated its lost profits are $84,075. No explanation is given as to how this figure was calculated.
¶ 23. In addition to the calculation of lost profits, DC General challenged the reasonableness of a near ten percent profit. Shoemake was asked whether a ten percent profit on a project such as this was reasonable. Shoemake testified that he had never made a ten percent profit on an approximately million-dollar job; rather, a more reasonable profit would have been “[f]ive or less” percent.
¶ 24. Because the verdict of the jury was a general verdict, we cannot say for sure why the jury decided upon $41,500 in damages. See Thompson, 86 So.3d at 238 (¶ 22). However, an additur “is not available to a plaintiff merely because a jury awards less than the plaintiff alleges to be owed.” Benchmark Health Care Ctr., Inc. v. Cain, 912 So.2d 175, 181 (¶ 14) (Miss.Ct.App.2005). An additur may be granted only if it is found that the jury’s award was so low as to shock the conscience, or if it was contrary to the overwhelming weight of the evidence. Walker, 955 So.2d at 931 (¶ 38). We cannot find the award was so inadequate as to shock the conscience, or that the verdict was against the overwhelming weight of the evidence. Likewise, we find the trial court did not abuse its discretion in denying the additur. We affirm the trial court’s judgment as to the denial of the motion for an additur.
B. COMPROMISE VERDICT
¶ 25. Slay Steel next argues that, in the alternative, if an additur is denied, a new trial on damages is warranted because the trial court failed to instruct the jury that compromise verdicts are not allowed.
¶ 26. After the jury deliberated, it announced that nine members had reached a verdict in favor of Slay Steel for $41,500. The trial judge polled the jury and discovered that only five of the twelve jurors agreed to the verdict. Since nine or more jurors must agree on the verdict in a civil case, the trial judge asked the jurors to continue deliberating. See Miss.Code Ann. § 13-5-93 (Rev.2012). Before leaving the courtroom, the jurors asked if they could explain their vote. The jury members stated they had first taken a vote on liability, and nine members agreed that DC General was liable. Then the jury voted on damages, and nine members agreed to an award of $41,500. However, the nine who voted for the award of $41,500 were not the same nine who voted in favor of liability. The trial judge instructed the *586 jury to continue deliberating until nine members agreed on the verdict.
¶ 27. While the jury was deliberating, Slay Steel requested that the judge instruct the jury that it was not allowed to reach a compromise verdict — that is, a verdict “where the jury compromise[s] between the issues of liability and amount of damages.” Dunn v. Jack Walker’s Audio Visual Ctr., 544 So.2d 829, 831 (Miss.1989). The judge agreed. But before the instruction could be given, the jury returned with the same verdict. When polled again, eleven of the twelve jurors stated they agreed DC General was liable to Slay Steel, and the same eleven agreed on the award of $41,500.
¶ 28. “There is no question but that our law condemns compromise verdicts.” Id. at 832. If a party fears the jury may reach a compromise verdict, the party can “request that the jury be instructed that it may not compromise between the question[s] of liability and damage.” Id.; see also Vicksburg Chemical Co. v. Thornell, 355 So.2d 299, 302 (Miss.1978). However, before we will disturb a verdict, “the complaining party must establish that the verdict was indeed a compromise verdict.” Dunn, 544 So.2d at 832.
¶ 29. Again, because the verdict was a general verdict, we cannot say for sure why the jury awarded $41,500 in damages. See Thompson, 86 So.3d at 238 (¶ 22). This particular amount was not presented by either party. However, this does not necessarily indicate the award was a compromise verdict. A compromise verdict occurs when the jury cannot agree on a verdict and, consequently, awards a lower amount of damages to get the agreement of the number required to reach a verdict — in other words, the jury compromises on damages to get an agreement on liability. Here, on both occasions that the jury was polled, at least nine members of the jury found Slay Steel was entitled to damages. Also, on both occasions, the jury awarded $41,500. Since the jury concluded Slay Steel was entitled to damages both times, this would seem to indicate no compromise was needed. Rather, Slay Steel’s contention seems to be solely with the amount of damages, which we have found did not evidence bias, passion, or prejudice and was not contrary to the weight of the evidence.
¶ 30. Despite the fact that DC General’s requested compromise-verdict instruction was not given, the judge did give a similar instruction before the jury returned to deliberate the second time:
BY THE COURT: You know, it doesn’t make sense to me for somebody that doesn’t find for the Plaintiff to be involved in assessing damages. That’s not acceptable. There need[s] to be nine of you that are in agreement as to for the Plaintiff or for the Defendant. If the nine are in agreement for the Plaintiff, then there needs to be an agreement as to the amount of damages. If you haven’t reached an agreement on both of those issues; nine people, those same nine people; then you’re to continue your deliberations.
Further, in jury instruction C-7, the jury was instructed that although “the precise amount of damage may be difficult to determine,” a verdict may not be rendered “based upon mere speculation or guesswork. ...” This instruction also states that the jury should be able to “arrive at the amount of damages with reasonable certainty ...,” but Slay Steel was not required to “prove the amount of those damages with mathematical precision.”
¶ 31. We find that Slay Steel has not established the jury reached a compromise verdict, or that reversal is warranted for *587 the trial court’s failure to instruct the jury against such a verdict. The jury was instructed that the same nine members who agreed on liability must have agreed on the damages award, and that the award must be determined with reasonable certainty. Slay Steel argues that because of the jury’s first vote on liability, it is possible that the damages verdict was a compromise verdict between those who found for liability and those who did not yet vote on damages anyway. Slay Steel argues this would explain the award of a lesser amount than demanded. However, it is a “fallacy ... that the possibility of a compromise verdict proves that one did in fact occur.” Dunn, 544 So.2d at 831. This issue is without merit.
¶ 32. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ROBERTS, MAXWELL AND FAIR, JJ„ CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.