# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01625-COA

WINSTON J. THOMPSON, III,                                         APPELLANTS
THOMPSON & ASSOCIATES, PLLC,
AND LAW OFFICE OF WINSTON J.
THOMPSON, III

v.

ANITA WHITE, INDIVIDUALLY, AS                                    APPELLEES
THE GUARDIAN OF RASHAUN D. GARDNER,
AND AS THE ADMINISTRATRIX OF THE
ESTATE OF ZELDA GARDNER AND
TAUREAN J. GARDNER, INDIVIDUALLY

DATE OF JUDGMENT:            09/26/2019
TRIAL JUDGE:                 HON. JOHN H. EMFINGER
COURT FROM WHICH APPEALED:   MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS:     GRAHAM PATRICK CARNER
ATTORNEYS FOR APPELLEES:     GREGORY MOREAU JOHNSTON
                             PRICE WILSON DONAHOO
NATURE OF THE CASE:          CIVIL - LEGAL MALPRACTICE
DISPOSITION:                 AFFIRMED - 09/21/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

## CONSOLIDATED WITH

## NO. 2020-CA-00565-COA

WINSTON J. THOMPSON, III,                                         APPELLANTS
THOMPSON & ASSOCIATES, PLLC,
AND LAW OFFICE OF WINSTON J.
THOMPSON, III

v.

**ANITA WHITE, INDIVIDUALLY, AS**                    **APPELLEES**
**THE GUARDIAN OF RASHAUN D. GARDNER,**
**AND AS THE ADMINISTRATRIX OF THE**
**ESTATE OF ZELDA GARDNER AND**
**TAUREAN J. GARDNER, INDIVIDUALLY**

DATE OF JUDGMENT:              05/22/2020
TRIAL JUDGE:                   HON. JOHN H. EMFINGER
COURT FROM WHICH APPEALED:     MADISON COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANTS:       GRAHAM PATRICK CARNER
ATTORNEY FOR APPELLEES:        GREGORY MOREAU JOHNSTON
NATURE OF THE CASE:            CIVIL - LEGAL MALPRACTICE
DISPOSITION:                   AFFIRMED - 09/21/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**SMITH, J., FOR THE COURT:**

¶1.     This matter comes before this Court as the consolidation of two cases on appeal. In

Case No. 2019-CA-01625-COA, the Madison County Circuit Court denied as untimely

Winston J. Thompson III's motion to set aside the default judgment awarded to Anita White.

Then in Case No. 2020-CA-00565-COA, the circuit court denied Thompson's motion to

enforce a settlement agreement against White, concluding there was no meeting of the minds

between the parties. Finding no error, we affirm the circuit court's judgments.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Both cases arise from the claims of White, Taurean J. Gardner, and Rashaun D.

Gardner (collectively "White") against Thompson, Thompson & Associates PLLC, and the

Law Office of Winston J. Thompson III (collectively, "Thompson"). The following sequence

of events pertains to both cases.

¶3.    On April 14, 2008, White filed a complaint against Thompson for legal malpractice. Thompson was served on April 21, 2008, but failed to answer or defend against the claim. Almost three years later, on April 7, 2011, White filed an amended complaint against Thompson, asserting additional claims. Thompson was served on July 7, 2011, but again failed to answer, appear, or otherwise defend against the claims. White applied for the entry of a default judgment and moved for a default judgment against Thompson on November 3, 2011. The circuit court held a hearing on the motion on February 23, 2012. After Thompson failed to appear at the hearing, the circuit court granted a default judgment against Thompson on March 5, 2012. Over a year later, on September 30, 2013, White filed a motion to determine damages from the default judgment against Thompson, and a hearing was held on November 12, 2013. Again, Thompson failed to appear or defend at the hearing, and on November 25, 2013, the circuit court granted a final default judgment against Thompson for $1,540,242.12 in damages.

¶4.    On October 7, 2016, five years after White filed her amended complaint and three years after the circuit court granted a final default judgment, Thompson filed a motion under Mississippi Rule of Civil Procedure 60(b) to set aside the default judgment. However, Thompson did not pursue the motion or take any further action for another two years. On September 17, 2018, White responded in opposition to Thompson's motion to set aside the default judgment. Thompson then filed the following motions: on September 25, 2018, a

3

reply to White's response in opposition of the motion; on October 1, 2018, an amended reply to White's response and a second amended reply; and on October 2, 2018, a third amended reply to White's response. On March 27, 2019, White filed a memorandum in opposition of Thompson's amended motion to set aside the default judgment.

¶5. Thompson filed a notice of hearing on the motion to set aside the default judgment on May 20, 2019. After the parties presented their motions, the circuit court entered its September 26, 2019 order denying Thompson's motion to set aside the default judgment. Aggrieved, Thompson appeals the circuit court's order. Subsequently, Thompson filed a motion on November 20, 2019, to stay the execution of the judgment and White filed a response opposing the motion on January 10, 2020.

¶6. Thompson's attorney initiated settlement-agreement negotiations with White's attorney through email on February 12, 2020. These email negotiations and settlement discussions continued until April 2, 2020, and ended in disagreement as to whether there was an enforceable, agreed-upon settlement. On April 13, 2020, Thompson moved to enforce a settlement agreement against White and attached email communications between the parties' counsel as evidence. That same day, White responded and opposed Thompson's motion to enforce a settlement agreement. On April 29, 2020, Thompson filed a reply to White's response in opposition to the motion to enforce a settlement agreement. After a hearing on the matter, the circuit court entered an order on May 22, 2020, denying Thompson's motion to enforce a settlement agreement. Aggrieved, Thompson appeals.

4

**DISCUSSION**

## I.     Settlement Agreement: Case No. 2020-CA-00565-COA

¶7.     Because the default-judgment issue in Case No. 2019-CA-01625-COA would be moot if an enforceable settlement agreement is found to exist in Case No. 2020-CA-00565-COA, we first review Case No. 2020-CA-00565-COA.

### A.     Issues Presented

¶8.     The main issue on appeal is whether there was a meeting of the minds between the parties on the essential terms of a settlement agreement. If there was a meeting of the minds, then the issue becomes whether there was an enforceable settlement agreement.

### B.     Standard of Review

¶9.     On appeal, this Court "reviews rulings on motions to enforce settlement agreements for abuse of discretion." *Crowley v. Germany*, 268 So. 3d 1277, 1278 (¶7) (Miss. 2018). "A settlement agreement is a contract," *Illinois Cent. R.R. Co. v. Byrd*, 44 So. 3d 943, 948 (¶16) (Miss. 2010), and "[t]he existence of a contract and its terms are questions of fact to be resolved by the fact-finder, whether a jury, or a judge in a bench[ ]trial." *Nat'l W. Life Ins. Co. v. Dunn*, 117 So. 3d 670, 672 (¶9) (Miss. Ct. App. 2013). "A circuit court judge['s] . . . findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." *Ammons v. Cordova Floors Inc.*, 904 So. 2d 185, 189 (¶13) (Miss. Ct. App. 2005).

### C.     Analysis

¶10.    The following additional facts are specific to the alleged settlement agreement. On February 12, 2020, Thompson's attorney, Graham Carner, initiated settlement negotiations with White's attorney, Greg Johnston, by emailing Johnston the following:

> Consistent with our recent phone call, I am writing to make Mr. Thompson's best shot offer to fully and finally resolve this dispute and satisfy the Judgment at issue. As I have explained, Mr. Thompson's financial condition is poor. . . . Mr. Thompson can access $150,000 to fully and finally resolve this matter. If accepted, the payment of this money must result in the satisfaction of the judgment entered in the Madison County cause and an agreement that all claims (including for attorneys' fees, interest, costs, etc.) of plaintiffs against Mr. Thompson and all of his related entities will be dismissed with prejudice/released.

Of note, when Thompson pursued a settlement agreement on February 12, 2020, he claimed that his "financial condition is poor." However, a mere eight days later, on February 20, 2020, as noted in the record, a news article publicly announced that Thompson had been co-counsel in a multi-million-dollar settlement case and would be entitled to a substantial portion of the $30 million dollars in legal fees that had accrued.

¶11.    Exactly a month after Carner's initial email, on March 12, 2020, Johnston responded by email and presented Carner with a counter-offer on White's behalf. Johnston stated:

> My clients are willing to settle this matter for $300,000. My clients would not require Mr. Thompson to provide any additional financial disclosures or asset verification and this settlement would provide a complete release and satisfaction of the outstanding judgment. . . . This would need to happen quickly and Mr. Thompson would agree to deposit the settlement funds in my trust account to be held in escrow while you and I put together the mutual, comprehensive release and the cancellation and satisfaction of judgment.

Six days later, on March 18, 2020, Johnston sent an email to Carner following up on the

6

March 12, 2020 counter-offer. Later that same day, Carner responded that he and Thompson "have had trouble catching up with one another," but he "expect[ed] to be back in touch" with Johnston soon about the March 12, 2020 counter-offer.

¶12.    The following three communications all occurred on March 24, 2020. First, Carner responded to the March 12, 2020 counter-offer on Thompson's behalf and stated the following: "My client has authorized me to counter at $180,000 to satisfy the judgment and dismiss/release all claims, pending or otherwise. Funds can be delivered in 30 days." Johnston then replied, as follows:

> [My clients] have not authorized me to respond to Mr. Thompson's $180,000, and have encouraged me to resume collection efforts. . . . I would encourage you to see if Mr. Thompson can do the $300,000 or something very close to it, or I'm afraid our settlement opportunity will elude us.

Almost immediately after receiving Johnston's email, Carner sent the following inquiry: "I understand but need a counter from your side. My suggestion: give me a counter with a bottom[-]line number such as $250k and I will do everything I can to get it settled at that number." Less than twenty minutes later, Johnston answered Carner's email explaining as follows:

> Based on the feedback from my clients, the counter at this point would be $300,000. Also, my clients are concerned about the lack of transparency regarding Mr. Thompson's law firm. In the financial disclosures[,] Mr. Thompson's interest in the law firm was not listed as an asset and no value was assigned to it. I think my clients are hesitant to negotiate further without knowing if Mr. Thompson has significant assets or funds in his law firm that have not been disclosed.

¶13.    The following sequence of communications took place on April 2, 2020. Initially,

7

Carner attempted to address Johnston's last communication from March 24, 2020, and sent an email to Johnston which stated:

> Mr. Thompson and his related entities accept the settlement demand of $300,000. Payment will be made within 30 days, following execution of an appropriate satisfaction of judgment and release. The terms of the settlement would also be confidential, except as necessary for taxation/financial planning purposes, etc. . . . I am glad we were able to reach a resolution of this matter.

Upon receipt of Carner's email, Johnston promptly replied:

> I think I can get support for the $300,000, but as mentioned in my last email my clients are concerned about the financial disclosures. As you will recall, we agreed not to go forward with the judgment[-]debtor exam provided that Mr. Thompson would provide some detailed financial disclosures. In the information you have provided to me, there is nothing regarding Mr. Thompson's law firm. . . . I just think my clients don't want to settle for 20% of the judgment and then read in the paper that Mr. Thompson just settled a huge case. . . . If we can get the financial disclosures agreed on and they paint the same picture as the things you have provided so far, then I think we can get this done.

Carner then responded, "Your prior email said your clients would agree to settle for $300,000 with no additional financial disclosure necessary. We have accepted that offer."

¶14.    Minutes later, Johnston contested Carner's alleged acceptance on Thompson's behalf and asserted:

> That is incorrect. My client's original offer was $300,000 without financial disclosures. Your client rejected that offer when he countered with $180,000. In my follow[-]up email I expressed my clients' concern about the financial disclosures and even if you could get the court to enforce the $300,000 amount, there were certainly other aspects of the settlement that had not been worked out.

In response, Carner argued, "You then countered at $300,000 and said your clients would not

8

negotiate further without additional information. We just accepted that counter." Johnston replied to Carner's argument with the following email:

> We can either work to settle this thing in good faith, or you can try to piece together the emails we have sent back and forth to attempt to argue that we agreed on a settlement which I can assure you won't work. . . . [If] you want me to tell my clients that Mr. Thompson will only settle for $300,000 if he doesn't have to make additional financial disclosures, then I will be happy to tell them that. . . . But don't try to tell me we have agreed on a final settlement when we clearly haven't.

Johnston's email was the final communication between the parties' attorneys related to negotiating a settlement agreement.

¶15.    Thompson argues that the email communications between the parties' counsel resulted in a meeting of the minds on the essential terms of a settlement agreement. Specifically, Thompson alleges the terms agreed upon are as follows: price of $300,000 to be paid by Thompson to White; and finality, with the settlement agreement fully and finally resolving and satisfying White's default judgment against Thompson. Moreover, Thompson claims the specific offer that was accepted did not include a deadline for Thompson to accept by, nor was it withdrawn.

¶16.    "[F]or there to be a settlement [agreement,] there must be a meeting of the minds," and the party seeking to enforce the agreement has the burden of proving "by a preponderance of the evidence that there was a meeting of the minds." *Dunn*, 117 So. 3d at 672 (¶10) (quoting *Vaughn v. Rettig*, 912 So. 2d 795, 799 (¶21) (Miss. 2005)). A meeting of the minds, or "[t]he manifestation of mutual assent[,] . . . ordinarily takes the form of an

9

offer or proposal by one party followed by an acceptance by the other party." Restatement (2d) of Contracts § 22(1) (1981). In the context of negotiations conducted by written "correspondence, one party must make a proposition and the other accept the same as made; in other words, the minds of the parties must meet upon a definite proposition," and the terms must be identical. *Morris v. Liberty Mut. Ins. Co.*, 659 F. Supp. 201, 204 (N.D. Miss. 1987); *see also Howard v. TotalFina E & P USA, Inc.*, 899 So. 2d 882, 889-890 (¶¶21-22) (Miss. 2005) (holding that letters back and forth between attorneys left "many questions that still existed and continue[d] to remain unanswered with regard to the purported settlement agreement[,]" and the "language [was] not indicative of a settlement agreement, but instead, it [was] indicative of a proposed settlement that provide[d] a conceptual framework for the Fina Group and Howard to further negotiate in an attempt to reach a firm settlement"); *see also Gulfport Pilots Ass'n, Inc. v. Kopszywa*, 743 So. 2d 1036, 1038 (¶10) (Miss. Ct. App. 1999) (holding "that there [was] ample evidence to conclude that a meeting of the minds did take place" based on specific language in both attorneys' letters explicitly confirming that a settlement had previously been reached). However, "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (2d) of Contracts § 26 (1981).

¶17. When the response to the offer is a proposal that changes the terms of the offer, it is a counter-offer and serves as a rejection. Restatement (2d) of Contracts § 39 (1981). Also,

10

when "[a] reply to an offer . . . purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered[, it] is . . . a counter-offer." *Hinds Cnty. Econ. Dev. Dist. v. W & G Props. LLC*, 203 So. 3d 49, 51 (¶7) (Miss. Ct. App. 2016) (citing Restatement (2d) of Contracts § 59 (1981)). Generally, "a counter-offer is a rejection, and it does have the same effect in terminating the offeree's power of acceptance. . . . [but] it carries negotiations on rather than breaking them off." Restatement (2d) of Contracts § 39 (1981). This Court has stated that "[a] rejected offer cannot constitute an enforceable promise. When an offer has been rejected, it ceases to exist." *Mooneyham v. Progressive Gulf Ins. Co.*, 910 So. 2d 1223, 1226 (¶11) (Miss. Ct. App. 2005). But when a rejection occurs and the offeror subsequently declares that the original offer "will continue in effect despite [the] rejection[,] . . . [it] makes a new offer." Restatement (2d) of Contracts § 38 (1981).

¶18. Thompson claims he accepted a definite offer containing the essential terms of price and finality presented by White, and as a result, the parties reached a meeting of the minds. After White's attorney explained that White had not authorized a response for continued negotiations, Thompson's attorney persisted and requested that White's attorney "give [him] a counter with a bottom line number." White's attorney responded that "the counter at this point would be $300,000" and noted White was "concerned about the lack of transparency regarding Mr. Thompson's law firm. . . . [and was] hesitant to negotiate further without knowing if Mr. Thompson ha[d] significant assets or funds." This response from White's

11

attorney should have given Thompson's attorney "reason to know that [White did] not intend to conclude a bargain until [White] ha[d] made a further manifestation of assent" to settlement terms. Restatement (2d) of Contracts § 26 (1981). As such, the offer Thompson claims to have accepted was in fact not an offer. Instead, it was a proposition that showed White's willingness to negotiate and indicated White's attorney's intent to refrain from entering a settlement agreement until White gave further approval. Thus, Thompson lacked the ability to accept the terms he alleges were offered by White, and he could not have reached a meeting of the minds with White.

¶19.    Nevertheless, even if we take into consideration White's response which explicitly gave a counter price of $300,000 and construe White's response as an offer, Thompson's proposal is a counter-offer that amounts to a rejection. Restatement (2d) of Contracts § 38 (1981). Thompson contends that the email from White's attorney answering Thompson's request for a counter price communicated the same offer as that presented by White on March 12, 2020. If the response from White's attorney is interpreted as a statement declaring White's original offer to "continue in effect despite [the] rejection," the result would be a new offer identical to the terms of White's first offer. *Id*.

¶20.    White's first offer provided for five terms: price of $300,000; no financial disclosures; finality; time was of the essence; and funds deposited in escrow until an agreement was drafted and signed. White's new offer presented to Thompson on March 24, 2020, would have included each of those five terms as well, since the new offer was made according to

12

the first offer. *Id*. Thompson's alleged acceptance of that offer agreed to only the two proposed terms of the price of $300,000 and finality. Although Thompson's response included those two identical terms, it contained a different time of payment; lacked provisions for financial disclosures and timeliness; and added a stipulation of confidentiality. Thompson's "reply to [White's] offer . . . purports to accept but is conditional on [White's] assent to terms additional to or different from those offered." *W & G Props.*, 203 So. 3d at 51 (¶7). Thus, Thompson's alleged acceptance on April 2, 2020, was a counter-offer, not an acceptance, and did not constitute a meeting of the minds between Thompson and White.

¶21. Thompson bore the burden to show that a meeting of the minds had been reached with White as to the essential terms of a settlement agreement. *Dunn*, 117 So. 3d at 672 (¶10). The email evidence Thompson provided failed to support his allegations and did not prove the existence of a definite offer and acceptance. Rather, the evidence showed that Thompson had presented a counter-offer, which acted as a rejection of White's offer. Therefore, we find no valid offer and acceptance and no mutual assent or meeting of the minds between Thompson and White. Upon concluding there was not a meeting of the minds, we find the circuit court did not err in denying Thompson's motion to enforce a settlement agreement.

## II. Default Judgment: Case No. 2019-CA-01065-COA

¶22. Because we find there was not an enforceable settlement agreement between the parties, we now consider Thompson's appeal of the circuit court's denial of his motion to set aside the default judgment.

13

## A. Issues Presented

¶23. The issue on appeal is narrow and asks whether the circuit court applied an erroneous conclusion of law when it denied the motion to set aside the default judgment based on the timeliness of the motion and the grounds asserted.

## B. Standard of Review

¶24. "We review a trial judge's decision to grant or deny a motion to set aside a default judgment only for an abuse of discretion. . . . [and] will not reverse a denial of such a motion unless we are convinced that the trial judge abused his discretion." *Villavaso v. S.H. Anthony Inc.*, 309 So. 3d 587, 595 (¶25) (Miss. Ct. App. 2020) (internal quotation marks omitted). This "standard[ ] of review, however, [is] predicated on the presumption that the trial judge applied the law correctly." *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 893 (¶12) (Miss. 2006). On appeal, this Court "may not rule on whether [the trial judge] was 'right' or 'wrong' in our view." *Detroit Marine Eng'g v. McRee*, 510 So. 2d 462, 467 (Miss. 1987). We must "consider whether the decision was one of those several reasonable ones which could have been made." *Smith v. Doe*, 268 So. 3d 457, 461 (¶8) (Miss. 2018).

## C. Analysis

¶25. Thompson claims the circuit court misapplied the law when it denied his motion to set aside the default judgment. Specifically, Thompson alleges the circuit court erred by focusing exclusively on waiver and the timing of his bankruptcy discharge claim, rather than conducting the three-part balancing test developed by the courts.

14

¶26.   "Rule 60 provides limited grounds for relief from judgments or orders." *Indymac Bank F.S.B. v. Young*, 966 So. 2d 1286, 1289 (¶11) (Miss. Ct. App. 2007).  The language of Rule 60(b) provides:

> On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceedings for the following reasons: . . . (4) the judgment is void; . . . (6) any other reason justifying relief from the judgment. . . . The motion shall be made within a reasonable time, and for reason (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken.

"A motion made pursuant to Rule 60(b)(4), (5), or (6) must be made 'within a reasonable time' after the entry of the judgment." *Ravenstein v. Ravenstein*, 167 So. 3d 210, 216 (¶10) (Miss. 2014) (quoting *M.A.S. v. Miss. Dep't of Human Servs.*, 842 So. 2d 527, 530 (¶16) (Miss. 2003)).  "What constitutes a reasonable time period is determined on a case-by-case basis." *Indymac Bank*, 966 So. 2d at 1290 (¶13).

¶27.   Here, before the circuit court decided the merits of Thompson's Rule 60(b) motion to set aside the default judgment, it addressed whether Thompson's almost three-year delay in filing his motion was reasonable. The grounds Thompson raised to support setting aside the default judgment included that "the claims asserted by [White] were pre-petition claims that were discharged in the bankruptcy" and the "[circuit c]ourt lacked the subject[-]matter jurisdiction required to award a [d]efault [j]udgment."

¶28.   The transcript of the hearing on Thompson's motion to set aside the default judgment shows that the circuit court concluded, "I have lots of concerns. But most of the concerns could have been resolved by Mr. Thompson filing a timely response in this case." The circuit

15

court then further elaborated as follows:

> [I]t's because Mr. Thompson did not file an answer, did not file a response. If he had filed a response and he'd come up with the suggestion of bankruptcy, then the issue could have been resolved in 2013 and - - or hopefully resolved in 2013 prior to the trial. . . . So I believe that the *Bell* [*v. First Columbus Nat'l Bank*, 493 So. 2d 964 (Miss. 1986)] case is controlling for me under the facts of this case and the timing. . . .

Thus, the circuit court found that Thompson's almost three-year delay was unreasonable and provided grounds to deny his motion for relief from the default judgment.

¶29. We find that sufficient evidence supported the circuit court's determination that Thompson's delay in filing his motion to set aside the default judgment was unreasonable and that the circuit court's denial of Thompson's Rule 60(b) motion was not an abuse of discretion. Further, we find the circuit court did not err by focusing on the timeliness and reasonableness of Thompson's delay when determining whether to set aside the default judgment against him.

## CONCLUSION

¶30. Because the evidence failed to prove a meeting of the minds for an enforceable settlement agreement and showed that there was sufficient evidence to support denying Thompson's motion to set aside the default judgment, we find no error in the circuit court's judgments and therefore affirm. We deny all other relief requested by Thompson and White on appeal.

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE AND**

16

**LAWRENCE, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. WESTBROOKS, McCARTY AND EMFINGER, JJ., NOT PARTICIPATING.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶32. I concur that the circuit court did not abuse its discretion by denying Thompson's Rule 60(b) motion to set aside the default judgment. I respectfully dissent in part regarding the majority's conclusion that there was no valid offer or acceptance and that there was no meeting of the minds between Thompson and White.

¶33. The Mississippi Supreme Court has stated that mutually agreed-upon settlements are contracts. *Est. of Davis v. O'Neill*, 42 So. 3d 520, 527 (¶28) (Miss. 2010). "The law favors the settlement of disputes by agreement of the parties and, ordinarily, will enforce the agreement which the parties have made, absent any fraud, mistake, or overreaching." *Id*. (quoting *Chantey Music Publ'g, Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1055 (¶11) (Miss. 2005)). "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *Parmley v. 84 Lumber Co.*, 911 So. 2d 569, 573 (¶22) (Miss. Ct. App. 2005) (quoting *D.H. Overmyer Co. v. Loflin*, 440 F. 2d 1213, 1215 (5th Cir. 1971)).

¶34. Because a settlement agreement is a contract, it must contain an offer, acceptance, and consideration. *Est. of Davis*, 42 So. 3d at 527 (¶29). A settlement/contract is formed when the offeree accepts the terms stated by the offeror. *Vice v. Hinton*, 811 So. 2d 335, 338 (¶12) (Miss. Ct. App. 2001). "In order to have a valid settlement agreement . . . there must be a

17

meeting of the minds between competent contracting parties." *Ammons v. Cordova Floors, Inc.*, 904 So. 2d 185, 190 (¶19) (Miss. Ct. App. 2005) (quoting *Viverette v. State Highway Comm'n of Miss.*, 656 So. 2d 102, 103 (Miss. 1995)). "Mississippi law requires the party claiming benefit from the settlement must prove by a preponderance of the evidence that there was a meeting of the minds." *Parmley*, 911 So. 2d at 572 (¶14).

¶35.    In the case at bar, on February 12, 2020, Attorney Carner, on behalf of Thompson, made an offer via email to settle any and all claims with White for the amount of $150,000. A month later on March 12, 2020, White's counsel, Attorney Johnston, made a counteroffer via email to settle with Thompson for $300,000:

> My clients are willing to settle this matter for $300,000. My clients **would not require Mr. Thompson to provide any additional financial disclosures** or asset verification and this settlement would provide a complete release and satisfaction of the outstanding judgment . . . . This would need to happen quickly and Mr. Thompson would agree to deposit the settlement funds in my trust account to be held in escrow while you and I put together the mutual, comprehensive release and the cancellation and satisfaction of judgment.

(Emphasis added). From this offer, Thompson could reasonably believe that White would settle for payment of $300,000 with no other disclosures.

¶36.    On March 24, 2020, Thompson rejected White's offer and counter-offered for $180,000. That same day, White rejected Thompson's offer and warned that Thompson should settle for $300,000 or something close to $300,000:

> [My clients] have not authorized me to respond to Mr. Thompson's $180,000, and have encouraged me to resume collection efforts. . . . **I would encourage you to see if Mr. Thompson can do the $300,000 or something very close to it, or I'm afraid our settlement opportunity will elude us.**

(Emphasis added). Significantly, there was no mention of a requirement of Thompson having to make any further financial disclosures. Because Johnston did not send a specific number, Carner sent the following email:

> I understand but need a counter from your side. My suggestion: give me a counter with a bottom[-]line number such as $250k and I will do everything I can to get it settled at that number.

¶37. Johnston responded, once again, stating that the counter would be $300,000:

> **Based on the feedback from my clients, the counter at this point would be $300,000.** Also, my clients are concerned about the lack of transparency regarding Mr. Thompson's law firm. In the financial disclosures[,] Mr. Thompson's interest in the law firm was not listed as an asset and no value was assigned to it. I think my clients are hesitant to **negotiate further** without knowing if Mr. Thompson has significant assets or funds in his law firm that have not been disclosed.

(Emphasis added). Johnston clearly made a specific monetary counter-offer, with no requirement that disclosures be made. The threat of adding further disclosures to the deal was clearly meant to induce Carner and Thompson to accept White's bottom-line amount—not as an additional condition of a settlement. On April 2, 2020, Carner sent an email stating that Thompson had accepted White's offer to settle for $300,000:

> Mr. Thompson and his related entities accept the settlement demand of $300,000. Payment will be made within 30 days, following execution of an appropriate satisfaction of judgment and release. The terms of the settlement would also be confidential, except as necessary for taxation/financial planning purposes, etc. . . . I am glad we were able to reach a resolution of this matter.

¶38. Once Thompson accepted White's counter-offer, there was a meeting of the minds on a settlement of $300,000. White never wavered on the price point in the amount of $300,000

19

throughout the emails and never added financial disclosures as a condition—but only raised them as potential conditions if the parties had to continue to negotiate further. Thompson's counsel had requested a "bottom-line" number, to which White's counsel gave the definite number of $300,000 via email. Johnston only stated that his clients were "concerned about the lack of transparency" and would "hesitate to negotiate further" without Thompson's financial disclosures. But Johnston's email did not require Thompson's financial disclosures as a condition to the settlement. In fact, the email stated that Johnston's clients would not accept any amount other than $300,000 without financial disclosures. To avoid any further negotiations, Thompson communicated his acceptance to settle for $300,000, as required to create a valid contract. *Stovall v. Hayes*, 984 So. 2d 1079, 1081 (¶12) (Miss. Ct. App. 2008). Only after Thompson's acceptance did White attempt to change the terms of the offer by adding a condition that Thompson should make further financial disclosures.[1] Johnston's

_____

[1] The majority briefly mentions *Howard v. TotalFina E & P USA, Inc.*, 899 So. 2d 882, 890 (¶22) (Miss. 2005), in which the Mississippi Supreme Court found that language in a letter did not conclude that a settlement existed. The letter stated that "the proposed settlement would include payment of $380,000 and transfer of the title of the property to a corporate entity." *Id*. The supreme court found that the language was not "indicative of a settlement agreement, but instead, it is indicative of a proposed settlement. . . ." *Id*. However, the case at bar is easily distinguishable from *Howard*, which is not on point. It is apparent from the initial email that financial disclosures were not a requirement or a condition for the settlement. Once Thompson's counsel requested a bottom-line number for an offer, White's counsel replied "[b]ased on the feedback from my clients, the counter at this point would be $300,000." Thompson's counsel replied: "Mr. Thompson and his related entities accept the settlement demand of $300,000." The language is unambiguous and definite.

Additionally, the majority also briefly mentioned *Gulfport Pilots Association, Inc. v. Kopszywa*, 743 So. 2d 1036, 1038 (¶10) (Miss. Ct. App. 1999). The *Gulfport* case

20

clients were willing to settle for $300,000 from the beginning of the negotiations without any financial disclosures. Therefore, it was reasonable for Thompson to believe that he was entering into a mutual agreement to settle for $300,000, without the requirement of financial disclosures.

¶39. Furthermore, White had the opportunity to revoke her offer or otherwise modify the terms of the offer prior to Thompson's acceptance. But once an offer is accepted, a party cannot withdraw or alter the offer because it has become a binding contract. *Heritage Bldg. Prop., LLC v. Prime Income Asset Mgmt., Inc.*, 43 So. 3d 1138, 1143 (¶10) (Miss. Ct. App. 2009) (quoting 17A Am. Jur. 2d Contracts § 60 (2004)). The only way that the settlement could have been modified after Thompson's acceptance was through a subsequent agreement between the parties. *DC Gen. Contractors, Inc. v. Slay Steel, Inc.*, 109 So. 3d 577, 581 (¶10) (Miss. Ct. App. 2013). White failed to modify and/or revoke the offer prior to Thompson's acceptance and failed to reach a subsequent agreement with Thompson after the settlement. Therefore, the $300,000 settlement was a valid, binding contract.

¶40. In sum, once White made the counteroffer to settle for $300,000, and Thompson had accepted the offer, a binding contract had been created. By law, White could not modify or revoke the offer after Thompson's acceptance to include obtaining his financial disclosures.

___

emphasizes the critical language which was used in letters regarding the settlement, such as "confirmed" and "settled." *Id*. In the case at hand, like *Gulfport*, the language in the corresponding emails was specific and clear in that the offer was accepted prior to any further negotiations regarding assets and liabilities.

Thus, the circuit court abused its discretion by denying Thompson's motion to enforce the settlement agreement.[2]  For the reasons stated above, I dissent.

---

[2] The majority points out that in Thompson's initial email on February 12, 2020, he represented that his financial condition was poor.  Thereafter, he made no further representations about his financial condition.  The majority's reference to a newspaper article concerning a settlement reached in another case on February 19, 2020, is irrelevant to whether there was a meeting of the minds in this case on April 2, 2020.